**UNITED STATES of America,**
**Plaintiff-Appellee,**
v.
**Jimmy Lee NAPIER,**
**Defendant-Appellant.**

**No. 74–2457.**

United States Court of Appeals,
Ninth Circuit.

June 13, 1975.

Certiorari Denied Oct. 14, 1975.
See 96 S.Ct. 196.

---

Norman Sepenuk (argued), Portland, Or., for defendant-appellant.

Charles H. Turner (argued), Asst. U. S. Atty., Portland, Or., for plaintiff-appellee.

## OPINION

Before BROWNING, WALLACE and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Defendant Jimmy Lee Napier was indicted on four counts of interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312 ("Dyer Act") and one count of interstate kidnapping in violation of 18 U.S.C. § 1201 ("Lindbergh Act").[1] Following a five-day jury trial, defendant was convicted by a jury on all counts.

Counts IV and V of the indictment, alleged that defendant kidnapped Mrs. Caruso in Oregon, transported her to Washington, and then drove her stolen car back to Oregon. There was very strong circumstantial evidence of defendant's involvement in the incident. Mrs. Caruso, a resident of Portland, Oregon, was found unconscious, with severe head injuries, near Vancouver, Washington. A broken rifle lay by her body. Blood and hair on the hammer of the weapon matched those of Mrs. Caruso; the barrel of the gun bore the fingerprints of the defendant. Tire tracks nearby corresponded to those of the Caruso car, which was later recovered in Oregon. Defendant's fingerprints were found on the car (including the steering wheel) and his personal papers and effects were discovered therein with Mrs. Caruso's purse. Defendant interposed three principal defenses: (1) intoxication, which produced amnesia and negatived

the requisite specific intent to commit the acts; (2) insanity due to mental disease ("pathological intoxication") and (3) failure of the government to prove beyond a reasonable doubt that Mrs. Caruso was transported across state lines.

Defendant raises two major issues on appeal. First, he argues that the court erred in admitting, as a "spontaneous exclamation", an out-of-court statement made by Mrs. Caruso. Second, he argues that the court erred in instructing the jury that knowledge of state lines was not an essential element of the kidnapping offense. We find defendant's contentions without merit and affirm the conviction.

## I.

### The Spontaneous Exclamation Issue.

Caruso was hospitalized for seven weeks following the assault, during which time she underwent two brain operations. There was testimony that she suffered brain damage which rendered her unable to comprehend the significance of an oath and therefore incapable of testifying at trial. It was also testified, although her memory was intact, that her communication with others was restricted to isolated words and simple phrases, often precipitated by situations of stress and strain. Approximately one week after Caruso returned home from the hospital, her sister, Eileen Moore, showed her a newspaper article containing a photograph of the defendant. Moore testified that Caruso looked at the photograph (but did not read the accompanying article), and her "immediate reaction was one of great distress and horror and upset," and that Caruso "pointed to it and she said very clearly, 'He killed me, he killed me.'" Moore also testified that no member of the family had attempted to discuss the incident with Caruso prior to the display of the photograph. The court admitted the statement, over defendant's objection that it was inadmissible hearsay, as a "sponta-

---

1. One count of illegal possession of a firearm by an ex-felon in violation of 18 U.S.C. App. § 1202(a)(1) was dismissed after the court granted defendant's motion for severance.

neous exclamation." We hold that the statement was properly admitted.

Although the government insists that the statement is a "verbal act" and thus not hearsay at all, we do not pass on this contention because it is our view that even if the statement is hearsay it falls within the exception for "spontaneous exclamation" or "excited utterances." Fed.R.Evid. 803(2) provides: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition [is not excluded by the hearsay rule]." Appellant disputes the applicability of the "spontaneous exclamation" exception. He argues that, since the statement "he killed me" refers to the assault, that event constitutes the "startling" event. Because the statement was not made under the stress of excitement caused by the assault, appellant insists that the statement is not within the exception. We reject appellant's analysis. The display of the photograph, on the facts of this case, qualifies as a sufficiently "startling" event to render the statement made in response thereto admissible.

Although in most cases the "startling" events which prompt "spontaneous exclamations" are accidents, assaults, and the like, cf. McCormick, Evidence § 297 at 705 (2d ed. 1972), there is no reason to restrict the exception to those situations. Wigmore, in the classic statement of the admissibility of spontaneous exclamations, writes:

> This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these conditions is an affray or a railroad accident. But the principle itself is a broad one.

6 Wigmore, Evidence § 1747, at 135 (3d ed. 1940) (footnote omitted). And McCormick writes of the nature of the event which underlies the exception: "The courts seem to look primarily to the effect upon the declarant and, if satisfied that the event was such as to cause adequate excitement, the inquiry is ended." McCormick, Evidence § 297, at 705 (2d ed. 1972). In the instant case where Caruso, having never discussed the assault with her family, was suddenly and unexpectedly confronted with a photograph of her alleged assailant, there can be no doubt that the event was sufficiently "startling" to provide adequate safeguards against reflection and fabrication.

## II.
### The Scienter Issue.

■ In instructing the jury on the elements of the kidnapping charge, the trial court stated:

> The defendant's knowledge or lack of knowledge of state lines is not an element of this offense. Thus, it is sufficient if the Government proves beyond a reasonable doubt that the defendant willfully and knowingly transported the victim from one point to another, and in so doing, he crossed a state line.

Defendant objected both before and after the charge was given, and he argues on appeal that knowledge of crossing state lines is an essential element of the offense. We hold that the instruction was proper. Eidson v. United States, 272 F.2d 684 (10th Cir. 1959).

The plain terms of the statute do not require that the offender know that he is crossing state lines. 18 U.S.C. § 1201 reads in relevant part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:
>
> > (1) the person is willfully transported in interstate or foreign commerce;
>
> .    .    .    .    .
>
> shall be punished by imprisonment for any term of years or for life.

Thus, a violation of the statute occurs whenever he "willfully transports" his victim and, in so doing, travels in interstate commerce. It is the act of kidnapping which the Lindbergh Act proscribes. The requirement that the offender cross state lines merely furnishes a basis for the exercise of federal jurisdiction and does not constitute an element of the offense.

Judicial precedent in this circuit supports our interpretation of the statute. In construing analogous federal criminal statutes, we have ruled that knowledge of the jurisdictional predicate is not an essential element of the offenses created thereby.[2]

The legislative history of the act is not inconsistent with our interpretation. It reveals that one of the evils sought to be remedied was the impunity with which kidnapping could be accomplished by crossing state lines and thereby thwarting arrest by police officers in the state of origin. As the defendant indicates, there was some discussion of sophisticated offenders who knew that the law was less scrupulously enforced in another state, and, for that reason, transported their victims to the other state. However, these references do not support the conclusion that Congress therefore intended to make knowledge of state lines an essential element of the crime. Indeed, whether or not the interstate transportation is prompted by the knowledge that the state of destination is "friendly" territory, officials in the state of origin were equally powerless to pursue and apprehend the kidnappers. It was precisely this problem that the statute was designed to overcome, and therefore it cannot be inferred that Congress intended to impose the scienter requirement that is urged.

In *Gardner, supra,* we stated, "Absent a contrary legislative intention, knowledge of a strictly jurisdictional element of a federal offense is not a prerequisite to conviction." 454 F.2d 534, at 535. No such intention can be ascertained here. We hold that the district court did not err in instructing the jury that knowledge of state lines is not an essential element of the kidnapping offense.

We find defendant's other contentions which we have discussed in an unpublished memorandum devoid of merit and affirm the conviction.

---

2. *E. g.,* United States v. Masters, 456 F.2d 1060 (9th Cir. 1972); United States v. Gardner, 454 F.2d 534 (9th Cir.), *cert. denied,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972); United States v. Roselli, 432 F.2d 879 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971); United States v. Howey, 427 F.2d 1017 (9th Cir. 1970); United States v. Kartman, 417 F.2d 893 (9th Cir. 1969); Bibbins v. United States, 400 F.2d 544 (9th Cir. 1968). In *Bibbins, supra,* this court held that a violation of the Dyer Act, 18 U.S.C. § 2312 (transportation of a stolen motor vehicle in interstate commerce) was made out where the defendant drove a vehicle which he knew was stolen across state lines, even though he had neither knowledge nor intention of crossing state lines. In *Bibbins, supra,* we relied in part on the reasoning of United States v. Powell, 24 F.Supp. 160 (E.D.Tenn.1938), where it was held that the government need not prove knowledge of state lines in order to secure a conviction under the Lindbergh Act. The identical principle logically applies to both offenses. In following *Bibbins* here, we thus reaffirm the authority of *Powell,* in its original context.