Stacey JOHNSON *v.* STATE of Arkansas

CR 95-427                                934 S.W.2d 179

Supreme Court of Arkansas
Opinion delivered October 28, 1996

*Richard Hutto* and *Mary Ellen Vandegrift*, Arkansas Public Defender Comm'n, by: *Deborah R. Sallings*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Stacey Johnson appeals his conviction for capital murder and his sentence of death by lethal injection. He raises multiple bases for reversal, including an assertion that his identification in a photo lineup by the victim's six-year-old daughter was inadmissible hearsay. We agree and reverse the judgment of conviction and remand for a new trial.

Carol Heath was brutally murdered in her duplex apartment in DeQueen on either the night of April 1, 1993, or the early morning hours of April 2, 1993. She was beaten, strangled, and had her throat slit while her two young children, Ashley, age six, and Jonathan, age two, were home. The facts regarding the murder and its aftermath are gleaned from pretrial and trial testimony. At approximately 6:45 a.m. on April 2, 1993, Rose Cassidy, the victim's sister-in-law, knocked on the victim's door but did not receive an answer. Because the door was unlocked, she entered and found

Carol Heath's partially nude body lying on the living room floor in a pool of blood. She ran across the street to call the police and then returned to check on her niece (Ashley) and nephew (Jonathan), whom she saw looking out the bedroom window. Cassidy testified that she asked Ashley what had happened. Ashley responded, according to Cassidy: "[S]omebody had broke in, and I said who, and she (Ashley) said a [b]lack man." The victim was white.

Sergeant Keith Tucker of the DeQueen Police Department testified that he found Carol Heath's body nude except for a t-shirt that had been pushed up around her neck. He stated that her body was located between a couch which was tilted up on its back legs and a coffee table which had apparently been moved toward the middle of the room. DeQueen Chief of Police James Smith arrived at the apartment later. He testified that when he pulled the t-shirt away from the victim's neck, he saw that her throat had been slashed.

Dr. Frank Peretti, an associate medical examiner for the State Crime Laboratory, testified that Carol Heath's death was caused by cutting her neck, strangulation, and blunt-force head injuries. He stated that her attacker left a four-inch by two-inch cut wound on her neck that went one-quarter inch into her spine. He observed that she had several bruises and abrasions on her head and face, that she had injuries on her hands and arms consistent with defensive wounds, that she had a bite mark on the nipple of her right breast and an abrasion on her left breast, and that there was a one-quarter-inch contusion on her right labia minora. Dr. Peretti could not conclude, based on the physical evidence, that she had been either sexually assaulted or raped.

Officer James Behling, a criminal investigator with the De-Queen Police Department, testified that he observed a pair of panties next to Carol Heath's right thigh. He noted an area of lighter-colored liquid between and around the legs and below the genital area of the victim. An empty douche bottle and an empty "Lifestyles" condom box were found in the bathroom sink.

On April 5, 1993, Kenneth Bryan found a purse in the woods between DeQueen and Horatio which he later realized belonged to the victim. He took Officer Behling to the location. Officer Behling examined the area and found a bloody pullover green shirt, a bloody white t-shirt, and a bloody towel. Lisa Sakevicius, an

expert with the State Crime Laboratory's trace evidence section, testified that hairs microscopically similar to the victim's hair were found on all three of these items. She further testified that hairs retrieved from under the victim's left breast, from the floor by the victim, and from the white t-shirt were of Negroid origin. Jane Parsons, a forensic serologist, testified for the State that no semen was found in connection with the victim. She admitted that the finding of semen would be unlikely, if the perpetrator used a condom and douched the victim.

DNA evidence was introduced at trial. Melisa Weber, a staff molecular biologist at Cellmark Diagnostics, conducted a Restriction Fragment Length Polymorphism [RFLP] test on the green shirt for the State and testified that to a reasonable degree of scientific certainty the blood matched that of Carol Heath. She also conducted a Polymerase Chain Reaction [PCR] test on several items, including the white t-shirt found in the park, a cigarette butt found in the green shirt, and hairs taken from the body of Carol Heath and near to where the body was located. With respect to the white t-shirt, Weber testified that the victim could not be excluded as the source of the blood and that the probability of this DNA having come from another Caucasian was 1 in 12,000. With respect to the cigarette butt and hairs, Weber opined that Johnson could not be excluded and that the probability that another African-American was the donor of the DNA in question was 1 in 250.

Officer Hayes McWhirter, an investigator with the Arkansas State Police, talked with the victim's daughter, Ashley Heath, on the afternoon of April 2, 1993. Also present at the time was Cynthia Emerson, a supervisor with the Department of Human Services. Officer McWhirter made the following notes from that conversation and used these notes to refer to when he testified at the pretrial hearings and at trial:

> Ashley stated her mother and I were on the couch when someone knocked on the door. She got up and opened the door. The picture No. 3, Stacey Johnson, is the one that came in the door. Ashley looked at six different pictures of black males.[1] Mother likes Branson. He works at In Your

---

[1] In testimony, Officer McWhirter revealed that Ashley looked at seven photographs. The photo lineup took place after Ashley had told Emerson and Officer McWhirter what had happened.

Ear. The Black male asked where Branson was. The black male used a girl sounding name. He had on a black hat with something hanging down in the back. He had on a green shirt and sweater. When they were talking, the black male said he had just got out of jail. The black male was mad at mother for dating Branson. He had been over two other times, but it was a while or a long time ago. The black male had about as much hair as [McWhirter.] I saw them fighting. Then I saw mother laying on the floor. I saw the black male leave and he got up and he got in a brown truck, I think. I saw a knife and a gun. The brown truck was parked beside the house. Mother looked out the window. When he knocked, then she let him in. While mother was laying on the floor, the black male walked into the bath room. We were hiding in the closet. I came out the door to the bath room and the black male had a knife in his hand beside mommy. She was on the floor bleeding. After he left, I went in and saw momma bleeding. Jonathan looked at mommy twice. She was covered in blood. We went to bed and then this morning when someone knocked on the door, I was scared to open the door. When Rose screamed, I knew she saw mommy with blood all over her. Every time I saw the black male, he had clothes on.

Officer McWhirter testified that he handed Ashley a stack of seven photographs, and she picked Johnson out of the photo lineup twice. Johnson was subsequently arrested in Albuquerque, New Mexico.

Prior to trial, the trial court found Ashley incompetent to testify due to psychological trauma and, thus, unavailable. That finding is not an issue in this appeal. Johnson then moved in limine to exclude all statements made by Ashley to Officer McWhirter and Emerson. Johnson argued in his brief in support of the motion that the selection from the photo lineup was one of the statements to be suppressed because it was the product of Ashley's reflection and deliberation and was made in response to questions during a time when Ashley showed no signs of excitement. After a hearing on whether her testimony as related by Officer McWhirter was hearsay, the trial court determined that Ashley's statements to the police

officer and Emerson met the criteria of excited utterances and were admissible as an exception to the hearsay rule. This ruling necessarily embraced Ashley's selection of Johnson from the photo lineup on the two occasions. The trial court also ruled that Ashley's statement to Rose Cassidy qualified as an excited utterance. At the same time, the court excluded statements made by Ashley to EMT personnel and to family even though these statements were made on the same day and prior to her statements to Officer McWhirter. The trial court determined that the statements were not reliable and did not qualify as excited utterances.

At trial, a jury found Stacey Johnson guilty of capital murder. Following the penalty phase, the jury found the crime to be aggravated by three circumstances: (1) Johnson previously committed another felony, an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person; (2) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody; and (3) the capital murder was committed in an especially cruel manner. The jury unanimously agreed that there were no mitigating circumstances and sentenced Johnson to death by lethal injection.

We first address whether Ashley's selection of Johnson's photograph from a photo lineup qualified as an excited utterance.

### I. Photo Lineup

At approximately 3:30 p.m. on the afternoon of April 2, 1993, Officer McWhirter, accompanied by Cynthia Emerson, a supervisor with the Department of Human Services, went to Ashley's grandparents' home to visit with Ashley. They took Ashley outside, and she told them what happened to her mother, which was related by Officer McWhirter at trial. After the statement, the police officer showed her seven photographs, one of whom was Johnson. She was told to look closely at the photographs. She went through the photographs carefully and selected Johnson's picture. Officer McWhirter then retrieved the photographs, shuffled them, and showed them to Ashley a second time. He asked her to look carefully again. She went back through the pictures and again she selected Johnson as the culprit. The trial court permitted testimony of the selection by the police officer as an excited utterance. We conclude that allowing this hearsay testimony as an excited utter-

ance was an abuse of discretion.

■ Rule 803(2) of the Arkansas Rules of Evidence defines the "excited utterance" exception to the hearsay rule: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This court has, on numerous occasions, applied this exception to cases involving the testimony of young children who may, or may not, eventually testify at trial. The basic requirements of the "excited utterance" exception are as follows:

> First there must be an occasion which excites the declarant. Second, the [s]tatement must be uttered during the period of excitement and must express the declarant's reaction to the occasion. In practice, these tend to merge together. If there was a sudden event which startled the declarant, his ensuing utterance will be assumed to be his reaction to the stimulus; if the statement appears to be excited, it will be assumed the occasion was exciting.

*Smith* v. *State*, 303 Ark. 524, 529-30, 798 S.W.2d 94, 97 (1990) (quoting 4 D. Louisell, *Federal Evidence* § 439 (1980)).

■ By allowing Officer McWhirter to testify about Ashley's photo selection, Johnson contends he was denied his right to confront Ashley as guaranteed under the Sixth Amendment. The right of confrontation provides two types of protection for a criminal defendant: the right physically to face those who testify against him and the opportunity to conduct effective cross-examination. *Delaware* v. *Fensterer*, 474 U.S. 15 (1985); *Suggs* v. *State*, 317 Ark. 541, 879 S.W.2d 428, *reh'g denied*, 317 Ark. 547-A, 879 S.W.2d 432 (1994); *Bowden* v. *State*, 301 Ark. 303, 783 S.W.2d 842 (1990). Johnson's counsel contends that he was foreclosed from asking Ashley questions such as: how was she able to see Johnson, how long did she see him, was her view blocked by furniture, were the lights on, and so forth.

■ The United States Supreme Court discussed the Confrontation Clause and exceptions to the Hearsay Rule in *Idaho* v. *Wright*, 497 U.S. 805 (1990):

> In *Ohio* v. *Roberts*, we set forth a "general approach" for determining when incriminating statements admissible under an exception to the hearsay rule also meet the require-

> ments of the Confrontation Clause. 448 U.S., at 65. We noted that the Confrontation Clause "operates in two separate ways to restrict the range of admissible hearsay." *Ibid.* "First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case . . . , the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Ibid.* (citations omitted). Second, once a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.' *Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.* In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*, at 66 (footnote omitted); see also *Mancusi* v. *Stubbs*, 408 U.S. 204, 213 (1972).

*Wright*, 497 U.S. at 814-15 (emphasis added).

■ The description by Officer McWhirter of how Ashley studied the photographs and made her two selections of Johnson's photograph smack of a deliberate and reflective act by the young girl and not of conduct we associate with spontaneity, excitement, or impulsiveness. Officer McWhirter testified at the omnibus hearing that he handed the photographs to Ashley "like a deck of cards." He stated that she went through them once or twice and that he told her to make sure "she looked at them good." She chose Johnson's photograph, and Officer McWhirter repeated the exercise. The evidence was a critical cog in the State's case, and the defense was completely thwarted in its ability to explore the matter through cross-examination of the declarant. This is not a case where a declarant is shown a picture by a family member and shrieks an identification. *See United States* v. *Napier*, 518 F.2d 316 (9th Cir. 1975), *cert. denied*, 423 U.S. 895 (1975). We know of no case in any jurisdiction which stands for the proposition that a request to identify followed by a deliberate choosing of an offender from a lineup such as we have here qualifies as an excited utterance.

■ The testimony by Officer McWhirter of Ashley's selection from the photo lineup should have been excluded as unreliable hearsay and as running contrary to Johnson's right to confront the witnesses against him. We reverse the trial court on this point and remand for a new trial. Because many of the points raised in this

appeal may occur again at retrial, we will address them. However, since we hold that the testimony of the photo lineup is inadmissible hearsay, we need not address the issue raised concerning the reliability of that lineup. There is the possibility that Ashley will be deemed competent to testify at a retrial of this matter, which would bring the lineup's legitimacy back into play. Nevertheless, we view that contingency as too speculative for us to consider the point.

## II. Points on Retrial

### a. Ashley's Statement to Officer McWhirter.

Though we consider the deliberate act of choosing from a photo lineup incompatible with the impulsive excitement and spontaneity associated with an excited utterance, we hold differently with respect to Ashley's verbal statements. We do so based on the descriptions of Ashley before and during her statement as provided by Cynthia Emerson and Officer McWhirter.

First, there are Cynthia Emerson's revealing comments at the competency hearing which related to Ashley's appearance and attitude on the afternoon of April 2, 1993. The conversation with the young girl occurred some nine hours after Ashley had been removed from the apartment where her mother lay covered in blood. After Emerson, Ashley, and Officer McWhirter went outside her grandparents' house, Ashley jumped into Emerson's lap. The police officer informed the young girl that he wanted to know what had happened to her mother, and Ashley "just started talking," according to Emerson. She added: "She just rambled about — you know it was out of sequence a lot."

Emerson's colloquy with the prosecutor follows:

PROSECUTOR: Would it be fair to say that Ashley had control over that statement you got?

EMERSON: Definitely, definitely.

PROSECUTOR: You said earlier that she had somewhat of an obsession to tell this?

EMERSON: Right. It's like — I don't know. Like some kids have a — something they want to get out. It's almost like an explosion. She just completely -- we didn't have any chance to really ask questions....

At the later omnibus hearing, Emerson testified that Ashley "rattled" to the police officer when telling her story and that it was "very fast pace[d]." On cross-examination, Emerson stated that Ashley became more excited as she was relating her story. At trial Emerson testified:

> EMERSON: You know, adults, you know, we put things in order. Kids, when they're upset or nervous about something, they just talk and, you know, it's not in sequence.

> PROSECUTOR: Okay. And you're saying that's the way Ashley's story was?

> EMERSON: Oh, yes. She was very eager to tell the story, in my opinion.

> PROSECUTOR: Was she upset?

> EMERSON: She was very upset and hyper, but it was like when she was telling us the story, she was just focused in on what was happening. She wasn't really aware that we were there. I mean she was telling us this story, but it wasn't a story to her. It was just something she needed to say.

Officer McWhirter's description of Ashley followed a similar theme. At one of the pretrial hearings, he responded affirmatively to the question: "She just unloaded on you?" At trial, he described Ashley at the time as "scared." He asked Ashley what had happened the previous night and then described her response:

> [T]he next thing I knew, she just started talking, spontaneous — I mean she started talking. She would go into one thing, she just kept talking and never stopped, and during the time she was talking she would ask me questions, which I wasn't going to answer, so we just let her keep talking until she finished.

■   Thus, you had a six-year-old child who from two reports was hyperactive, scared, and excited when she told about the murder of her mother on the afternoon after the homicide. In discussing the criteria we weigh in considering the excited-utterance exception, we have looked in the past to a summary set out by the Eighth Circuit Court of Appeals in *United States* v. *Iron Shell*, 633 F.2d 77 (8th Cir. 1980):

> The lapse of time between the startling event and the out-of-

court statement although relevant is not dispositive in the application of 803(2). Nor is it controlling that [the declarant's] statement was made in response to an inquiry. Rather, these are factors which the trial court must weigh in determining whether the offered testimony is within the 803(2) exception. Other factors to consider include the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements. In order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation.

*Id.* at 86 (internal citations omitted) (*quoted in Smith* v. *State*, 303 Ark. 524, 531, 798 S.W.2d 94, 98 (1990)).

■ This court further took note in the *Smith* case of the fact that the trend was toward expansion of the time interval after an exciting event and that some courts are more liberal in doing so when the declarant is a child. *Smith* v. *State*, 303 Ark. at 530, 798 S.W.2d at 97 (citing D. Binder, *Hearsay Handbook* § 2.03 (1983)). This court has followed that trend. *See, e.g., Greenlee* v. *State*, 318 Ark. 191, 884 S.W.2d 947 (1994) (excited utterance made the next morning by a six-year-old informing parent of sexual abuse the previous night); *Suggs* v. *State, supra* (excited utterance made by boys 24 to 30 hours after having witnessed their mother being stabbed 144 times); *Cole* v. *State*, 307 Ark. 41, 818 S.W.2d 573 (1991) (excited utterance made the day after the rape by twenty-three-year-old mentally retarded victim with the mental capacity of a six-year-old); *George* v. *State*, 306 Ark. 360, 813 S.W.2d 792 (1991), *reh'g denied*, 306 Ark. 374-A, 818 S.W.2d 951 (1991) (excited utterance made when two-and-a-half-year-old child awoke from a nightmare and related story of sexual abuse); *Smith* v. *State, supra* (excited utterance made the next morning by a three-year-old after witnessing a murder the previous afternoon). In light of the authority, we do not view the statement by Ashley made more than nine hours after her mother's body was discovered and she was removed from the apartment as inconsistent with the spontaneity and impulsiveness associated with an excited utterance.

The trial court also dubbed Ashley's statement to Rose Cassidy concerning a black man as the culprit as an excited utterance. But the court then refused to allow various comments by Ashley made

prior to the conversation with Officer McWhirter and Cynthia Emerson:

- To EMT Archie Johnson about 7:00 a.m. that Ashley and her mother heard something in the house and that her mother got up to see what it was and had fallen.

- To the victim's sister, Melissa Cassidy during a 45-minute conversation that a black man broke in and killed her mother.

- To her grandmother, Arlene Heath, over the course of the day that she heard someone come in the apartment and saw him sit on the couch playing with a gun, that she hid by the television set in the hall and saw her mother lying in blood, that the man was bald but also had a black hat, that he was wearing blue jeans and boots, that he had on black pants and a green jacket and a black shirt with red and orange designs, that he had a gold ring with glass in it and wore a tie, and that he was chunky.

The trial court gave no explanation for why it found these statements unreliable and not excited utterances. A reasonable explanation would be that a statement made during a 45-minute conversation or random comments made during the course of the day do not pass muster. Certainly, the foundation laid by Cynthia Emerson and Officer McWhirter regarding Ashley's excited demeanor when telling her story was not similarly laid for the statements made to Archie Johnson, Melissa Cassidy, and Arlene Heath.

We conclude that the trial court did not abuse its discretion in allowing Officer McWhirter to testify to what Ashley told him. Accordingly, we hold that at the retrial of this matter Ashley's description of the crime as related to Cynthia Emerson and Officer McWhirter, other than her identification of Johnson from the photo lineup, is admissible as an excited utterance and does not violate the Confrontation Clause.

*b. Testimony of Drug Trafficking and Rule 404(b).*

Johnson moved in limine to prevent the State's witnesses from mentioning any connection between him and drug trafficking. The motion was denied. Johnson raised the issue again prior to trial, and it was again denied. At trial, Shawnda Helms testified as part of the

State's case that Johnson approached the victim and her on two occasions. The first occasion was on February 1, 1993, during a social gathering at the victim's house: "[H]e called us into the kitchen and asked us if we knew anybody or anyway that we could help transport some kilos because he needed to have them transported, and then he asked me and Carol if we would go out with him and we told him no, because we didn't date [b]lack guys." Helms testified that she understood "kilos" to mean "cocaine." The second occasion was on February 15, 1993, at an establishment named "In Your Ear": "Stacey called us over there and asked us if we had thought of anybody who could help him transport them (kilos) and we told him no, [a]nd then he asked Carol again if she would go back out with him — if she would go out with him, and she said no." Helms testified that when they refused to help with the cocaine, Johnson "looked like he was mad. He was pretty upset with our answer."

Johnson's argument on appeal is twofold. First, he contends that the statements are inappropriate "propensity" evidence under Ark. R. Evid. 404(b). Secondly, he maintains that even if the statements were relevant, their probative value is substantially outweighed by the danger of unfair prejudice under Ark. R. Evid. 403. He argues that the drug references did nothing but "impugn his character and improperly sway the jury's mind against him." The State counters that Johnson's requests about transporting cocaine are excepted from Rule 404(b) because they established knowledge of the victim. It can also be garnered from the testimony of Shawnda Helms that refusal to transport drugs as well as the refusal to date were motives for the slaying.

We agree with the State that the evidence was permissible. Both knowledge and motive are exceptions to Rule 404(b). Nor do we view the evidence as unfairly prejudicial under Rule 403. The relevance of circumstances which tie the perpetrator to the victim and raise a possible motive for the killing is patently obvious. The fact that that knowledge came about in the context of an attempted drug deal should not be grounds for excluding testimony about the proposed transaction.

There is also the fact that Johnson did not request a limiting instruction that the drug testimony not be considered for the purpose of finding Johnson to be a bad man. To be sure, refusal to request such an instruction could well have been a matter of trial

strategy on defense counsel's part. Yet, an instruction of that kind would have directed the jury's attention away from Johnson's character and toward the motive and knowledge exceptions.

There was no error in allowing the drug testimony.

*c. DNA Testimony.*

The two sides waged a fierce battle over the admission of statistical probabilities with respect to PCR testing. Johnson presented testimony by Dr. Mark Crew, a molecular biologist, that the underlying databases used by Cellmark Diagnostics for PCR testing were unreliable because they were insufficient in size. In his opinion, the databases were unreliable because they did not include samples taken from the Sevier County gene pool.

Dr. Charlotte Word, a molecular biologist with Cellmark, admitted that the databases employed for the PCR testing took samples from major metropolitan areas rather than from Arkansas. But she also stated that the databases were tested and determined to be in Hardy-Weinberg Equilibrium, meaning that the frequency of certain types of genes in the general population is adequately reflected in the databases. When this equilibrium is attained, it is then possible to predict the frequency, in terms of the entire population, of how common it would be to find a combination of the different genes in one person.

This court recently decided this issue against Johnson. *See Moore* v. *State*, 323 Ark. 529, 915 S.W.2d 284 (1996). In *Moore*, we stated:

> The trial court also correctly determined that any challenge to the conclusions reached by the state's expert, *including the statistical probability of whether the test results constituted a match*, would appropriately be made at trial, by cross-examination of the state's experts and presentation by the defendant of his own experts to express differing opinions about the results of the FBI tests and statistical probability of a match.

*Moore*, 323 Ark. at 547, 915 S.W.2d at 294 (emphasis added). Furthermore, experts for both Johnson and the State agreed that Cellmark provided "falsely conservative" statistical probabilities, a factor that this court has afforded some weight in assessing whether databases were in Hardy-Weinberg Equilibrium. *See Prater* v. *State*, 307 Ark. 180, 820 S.W.2d 429 (1991).

■ Johnson all but concedes that the battle of the experts over statistical probabilities is a matter for litigation and cross-examination. Nevertheless, he asks this court to revisit the issue and consider excluding the DNA tests. We decline to do so. There was no error in allowing this evidence to be presented to the jury.

*d. Intent to Date a Black Man.*

The State extracted statements from four witnesses that Carol Heath did not date black men or entertain black men in her home. In response to this evidence, Johnson attempted to introduce the testimony of Cynthia Johnson, who worked with the victim at DHS, that Carol told her on Wednesday, March 31, 1993, that Doyle Green, an African-American, had asked her for a date. Green was an auditor who lived in Little Rock but was in DeQueen apparently doing some work for the local DHS office. Cynthia Johnson also testified that Green was the only one of three Little Rock auditors who decided to spend the following night, April 1, 1993, in DeQueen, thus creating the inference that he could have been the murderer. She admitted, however, on cross-examination that she did not know Carol Heath on a personal basis and had no idea whether she actually dated Doyle Green.

■ The trial court properly found this testimony to be unduly speculative and properly excluded it. Evidence that does no more than create an inference or conjecture of another's guilt is inadmissible. *Zinger* v. *State*, 313 Ark. 70, 852 S.W.2d 320 (1993) (citing *State* v. *Wilson*, 367 S.E.2d 589 (N.C. 1988)). There was no abuse of discretion.

*e. Narrowing of Offenses.*

■ This court has laid to rest the argument that an unconstitutional overlapping occurs between our capital murder statute and our first-degree murder statute. The argument put forth by Johnson was answered recently in *Nooner* v. *State*, 322 Ark. 87, 107, 907 S.W.2d 677, 687-88 (1995):

> Nooner argues that the definition of capital murder does not sufficiently narrow the crime for which the death penalty can be imposed. He specifically alludes to overlap between definitions of capital murder and first degree murder, which we have already discussed. The United States Supreme Court has held that the required narrowing of

crimes susceptible to the death penalty may occur at the penalty phase of the trial. This court has previously held that our statutes pass the narrowing requirement by limiting the death penalty to crimes involving sufficient aggravating circumstances. There is no merit to Nooner's contention. (Citations omitted.)

*See also Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943 (1996); *Reams v. State*, 322 Ark. 336, 909 S.W.2d 324 (1995); *Greene v. State*, 317 Ark. 350, 878 S.W.2d 384 (1994); *Buchanan v. State*, 315 Ark. 227, 866 S.W.2d 395 (1993); *Mauppin v. State*, 309 Ark. 235, 831 S.W.2d 104 (1992). The same holds true in this case. Johnson's argument is meritless.

*f. Especially Cruel as an Aggravating Circumstance.*

■ Johnson contends that the "especially cruel" aggravating circumstance, codified at Ark. Code Ann. § 5-4-604(8) (Repl. 1993), is vague and overbroad and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, section 9 of the Arkansas Constitution. We have previously decided this "vague and overbroad" argument against an appellant, and in doing so we stated:

> The previous "especially heinous, atrocious, or cruel" aggravating circumstance was declared unconstitutional by this court because it was so vague that it violated the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment. *See Wilson v. State*, 295 Ark. 682, 751 S.W.2d 734 (1988). The legislature rewrote the aggravating circumstance in 1991 and based the statutory definitions of "especially cruel manner" and "especially depraved manner" on the Arizona Supreme Court's limiting interpretation of its "especially heinous, cruel or depraved" aggravating circumstance that had been found by the United States Supreme Court to pass constitutional muster.

*Greene v. State*, 317 Ark. 350, 360-61, 878 S.W.2d 384, 390 (1994) (citing *Walton v. Arizona*, 497 U.S. 639 (1990)). *See also Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995); *Coulter v. State*, 304 Ark. 527, 804 S.W.2d 348 (1991). Johnson has advanced no argument that persuades us to interpret the Arkansas Constitution in a contrary manner.

■ Nor can there be any doubt that evidence abounded that the murder was perpetrated in an especially cruel manner. The considerable damage to the body of the victim is testimony to that fact. There were, too, the defensive wounds, the circumstantial evidence of rape, and the bloody fingerprint of the victim found on the linen closet which suggested Carol Heath did not die immediately.

### g. Aggravating Circumstances — Narrowing the Class.

Johnson contests the avoiding-arrest aggravator in this case and urges that all murders could arguably have been committed to avoid arrest. As a consequence, he contends that this aggravating circumstance did not effectively narrow the class of persons eligible for the death penalty for the jury's purposes.

■ This precise overbreadth argument has previously been rejected by this court, and Johnson cites no authority that persuades us to change our position. See Coulter v. State, supra. Johnson further argues that the statute is unconstitutional in that it allows for a finding of aggravating circumstances at a lesser standard than "beyond a reasonable doubt." This argument is belied by the plain language of Ark. Code Ann. § 5-4-603 (Repl. 1993), which requires findings of aggravators beyond a reasonable doubt and by the penalty-phase verdict form returned by the jury in his case.

The State argues that the murder was committed for the purpose of eliminating Carol Heath as a victim-witness in a battery trial or as a prosecutrix-witness in a rape trial. This is evidenced, according to the State's theory, by his attempts to "clean up" the victim and eliminate circumstantial evidence of rape, and his immediate departure to Albuquerque, New Mexico after the crime.

■ We need not address this argument. First, there is no assurance that this particular aggravator will be submitted on retrial. But, in addition, there were two other aggravating circumstances found by the jury which clearly outweighed the jury's finding of *no* mitigating circumstances. Hence, the error, if any, was harmless. See Ark. Code Ann. § 5-4-603(d) (Repl. 1993). Accord Kemp v. State, supra.

### h. Victim-Impact Testimony.

During the prosecution's closing argument at the penalty phase, he made several statements that Johnson classifies as "victim

impact" evidence: "I sure hope you won't forget the right that Carol Heath had to life, the right that she had to learn and grow and love her two children and that right they had to know and love their mother" ... "The manner in which Carol Heath was left with those two children justifies the death penalty" ... "Punish the man who took away Carol Heath's rights to know and love and watch Ashley grow up and marry.... And watch Jonathan grow up and to struggle with Jonathan, to do things with him and see him grow up" ... "[Carol's parents] have rights. They've lost a precious daughter."

Johnson argues that the victim-impact statute, Ark. Code Ann. § 5-4-602(4) (Repl. 1993), does not give sufficient guidance to the judge and jury as to what comprises victim-impact evidence, and as such it violates the Eighth and Fourteenth Amendments to United States Constitution and Article 2, section 9 of the Arkansas Constitution. He also attacks the relevancy of the prosecutor's statements to the penalty phase and claims that § 5-4-602(4) has impermissibly been applied retroactively and, thus, is an *ex post facto* law.

The simple answer to Johnson's argument is that arguments of counsel are not evidence, and the trial court instructed the jury accordingly. *See* AMCI 2d 101(e). Furthermore, there was no objection or request for an admonition at the time the prosecutor made these statements. *See Woodruff* v. *State*, 313 Ark. 585, 856 S.W.2d 299 (1993). But, in addition, these issues were decided in *Nooner* v. *State, supra*, against the appellant. In *Nooner*, this court held: "[B]y expanding the scope of permissible evidence during the penalty phase, the General Assembly has not expanded the scope of punishment or added a new aggravating circumstance. We hold that permitting this testimony . . . did not constitute an *ex post facto* law." *Nooner*, 322 Ark. at 109, 907 S.W.2d at 689.

In *Nooner*, we also upheld the underlying constitutionality of victim-impact testimony. *See Nooner*, 322 Ark. at 322-23, 907 S.W.2d at 688-89 (citing *Payne* v. *Tennessee*, 501 U.S. 808 (1991)). As was the case in *Kemp* v. *State, supra*, Johnson does not put forth an argument that would convince this court to interpret the provisions of the Arkansas Constitution in a different manner.

Reversed and remanded.

DUDLEY, NEWBERN, and ROAF, JJ., concur in part; dissent in part.

ROBERT H. DUDLEY, Justice, concurring in part and dissenting in part. I concur in reversing and remanding for a new trial. The murder victim's six-year-old daughter, Ashley, was available to testify, but was incompetent to testify because the memory of her mother's murder was impaired. Even so, the trial court allowed a police officer, Hayes McWhirter, to testify that Ashley, after carefully studying a photo lineup, identified appellant as the murderer. I wholeheartedly agree with the majority opinion that the ruling constituted prejudicial error. The officer's testimony about the six year old's identification of appellant was hearsay. Ark. R. Evid. 801. The trial court allowed the testimony in evidence under the excited utterance exception to the hearsay rule, Ark. R. Evid. 803(2). The delayed and careful selection of a photograph simply is not an excited utterance under Rule 803(2). Thus, I concur in reversing and remanding the case for a new trial.

The majority opinion goes further, however, and holds that upon retrial, Officer Hayes McWhirter and an employee of the Department of Human Services, Cynthia Emerson, can testify about statements the six year old made to them. The majority opinion will allow the testimony at the retrial under the excited utterance exception to the hearsay rule. I would not allow the statements because they do not fit within the firmly rooted holdings embracing the excited utterance exception, and, by allowing the statements in evidence, the majority will deny appellant the right of confrontation.

The facts are these. Rose Cassidy discovered Carol Heath's corpse in the living room of the victim's home at about 6:45 in the morning on April 2, 1993. Ms. Cassidy, the victim's sister-in-law, hurriedly went to a neighbor's house and called the police. Upon returning to the victim's home, she saw the victim's six-year-old daughter, Ashley, and her brother looking out the bedroom window. Ms. Cassidy said Ashley was scared, but not crying, and was able to respond to questions. Ms. Cassidy asked Ashley what had happened, and Ashley answered that a black man had broken in.

By 7:00 a.m. the police and an ambulance had arrived, and the children were taken out of the house through a window so that they would not see their mother's corpse. In pretrial hearings, a medical technician, Archie Johnson, testified that Ashley was "not emotional" and that she answered questions about her condition, but she seemed to be in shock because she was quiet. He said that she

helped him find her clothes. He said that Ashley told him they were all asleep when they heard something, and her mother got up to see what it was. The the next thing she knew was that her mother had fallen. She did not mention seeing an assailant. The trial court ruled that the statements given to Archie Johnson were not admissible. It is highly significant that the trial court found that the statements to Rose Cassidy and Archie Johnson were not admissible. The import of the ruling was that Ashley's first two statements, which did not implicate appellant, were not allowed as excited utterances, and the State does not cross-appeal from that ruling.

Ashley and her brother waited in the ambulance until their grandfather, John Heath, took them to his home. Arlene Heath, their grandmother, testified at a pretrial hearing that when she got to their home, Ashley was "totally out of control." The grandmother indicated that Ashley "rambled on and on" about what had happened to her mother, and it took about thirty minutes to calm her. During most of the remainder of the day Ashley told her grandmother about the murder, and the details of the story varied. For example, Ashley told her grandmother that she saw the man when he came in the front door (not mentioning a break-in in this version), that she got up when he came in, and that she saw the man sitting on a couch while playing with a pistol. At one time she told her grandmother that she hid by the television set in a hall and that she saw her mother lying in blood. Throughout the day, Ashley's descriptions of the intruder gained in detail, but also became more discrepant. She said the man was bald, but also wore a black hat. She said he was wearing blue jeans and boots, but later she described black pants, a green jacket, a black shirt with red and orange designs, a gold ring, and a tie. Just before 3:30 that afternoon she said she heard someone in the house and saw a "bald black man" wearing a black shirt and pants, green jacket, and red bandanna. She said the man was "chunky." It is again highly significant that the trial court did not allow this hearsay into evidence, and the State does not cross-appeal from the ruling.

The next person to talk to Ashley was the victim's sister, Melissa Cassidy. She arrived at the grandparents' home at about 8:55 a.m., but waited twenty to thirty minutes before going inside. At about 10:30, or almost four hours after the murder was discovered, and presumably considerably longer since the murder took place, Ashley sat in Melissa's lap and cried for perhaps forty-five

minutes. During this time Ashley "blurted out" that a black man had broken in and killed her mother. Melissa remained at the house most of the day. She testified at a pretrial hearing that many visitors arrived and left, and some visited with Ashley. She said that during the day Ashley had periods of calm, she even played with her cousin for a while, but at other times she was upset. Again, it is significant that the trial court refused to allow the statements made to Melissa into evidence, and the State does not cross-appeal.

Officer Hayes McWhirter went to the grandparents' home at 3:30 in the afternoon to question Ashley. He asked Cynthia Emerson, an employee of the Department of Human Services, to accompany him "to see if Ashley could tell us anything to help with the case." When they arrived, Ashley was playing outside the home. McWhirter talked to the grandparents while Emerson made small talk with Ashley, who was neither emotional nor crying. McWhirter took Ashley to the side of the house to question her. She was timid at first and refused to talk because he had a tape recorder. After he put the tape recorder away, Ashley began to ask him questions about the murder. McWhirter asked her to tell him what she could remember. Because it is critical, his testimony, as abstracted, was: "I said we need you to tell us what you saw last night. We just told her that anything she could remember from last night or who might have been in her house to do this to her mother we needed to know. Then I didn't say anything. She just unloaded on me." In doing so, Ashley gave yet another account, the most detailed account of the day. She said her mother and she were sitting on a couch (not asleep or in bed), that someone knocked, and her mother answered and let the man in (no break-in). She said the man asked where Branson was; that the man had a "girl sounding" name (new fact); that he was wearing a black hat with something hanging down the back (new fact), a green (not black) shirt and a sweater (new fact). She said the man had just gotten out of jail and was mad at her mother for dating Branson (new fact). She said the man had hair like McWhirter's; that she saw the man and her mother fighting (new fact) and saw the man leave in a brown truck (new fact); that he had a gun and a knife (new facts); and that he went to the bathroom while her mother lay on the floor (new facts). Ashley said she was hiding in the closet (new fact), and that she saw the man standing by her mother with a knife in his hand when she came out of the closet to go to the bathroom (new facts). After he left, she went to bed. McWhirter then showed Ashley a photo lineup, and

she picked the murderer out of the lineup. McWhirter did not testify that Ashley was emotional, crying, or distressed while he questioned her. He testified that she was "excited," but admitted she was "in control." In sum, a police officer went to the grandparents' home to question the six-year-old witness, but the six year old would not talk to him at first. He put away his tape recorder and asked the six year old to tell him what happened. Ashley did not make a spontaneous outburst. The officer did not testify that Ashley was crying, emotional, or distressed when he began to question her. Yet, the majority opinion holds that her answers can come in under the exited utterance exception to the hearsay rule.

The trial court did not find that statements made to Archie Johnson shortly after 7:00 a.m., or immediately after an adult discovered the murder, were excited utterances, and the State does not cross-appeal; the trial court did not find that statements made to Melissa Cassidy at about 10:30 that same morning were excited utterances, and the State does not cross-appeal; the trial court did not find that statements made to the six year old's grandmother, Arlene Heath, during the course of the day were excited utterances, and the State does not cross-appeal. Yet, the trial court held, and the majority opinion affirms, that responses given to a policeman later in the day are admissible as an excited utterance. None of the cases cited in the majority opinion support such a holding.

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ark. R. Evid. 803(2). Here, under the law of the case, the declarant was not "under the stress of excitement caused by the event" from 7:00 a.m. until 3:00 p.m., but in some way went into the stress of excitement in response to police questioning. A recitation of past events does not constitute an excited utterance. *Marx v. State*, 291 Ark. 325, 724 S.W.2d 456 (1987). The statements were not spontaneous utterances; rather, they were a product of questions by the officer. Although the declarant was only six years old, she obviously had discussed her mother's murder with others and then added many new facts upon questioning by the officer. This was not a mere utterance; it was complete statement. The issue is not whether the excited utterance is accurate; rather, it is whether it is trustworthy, and trustworthiness comes from spontaneity under stress and a lack of reflection and deliberation. *Cole v. State*, 307 Ark. 41, 818

S.W.2d 573 (1991). It was the same officer who showed Ashley the photo lineup at the same interview. In some way, the majority opinion holds her response to the lineup is hearsay, but the accompanying statements are not hearsay. The statements do not come within the deep-rooted guarantees of trustworthiness. As a result, appellant will be denied his right of confrontation. I would not allow the responses to Officer McWhirter's questions into evidence upon retrial.

NEWBERN and ROAF, JJ., join.