IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 2000 Session

## STATE OF TENNESSEE v. JAMES RAYMOND SNIDER

**Appeal from the Circuit Court for Madison County**
**No. 98-630      Roy B. Morgan, Judge**

---

**No. W1999-01849-CCA-R3-CD - Decided August 18, 2000**

---

The defendant was found guilty of rape of a child and aggravated sexual battery. He appealed, arguing that the evidence was insufficient to support a guilty verdict and that the trial court erred in allowing the victim's mother to testify to hearsay statements made by the victim, in prohibiting the defendant from questioning the victim's mother about sexual abuse in her childhood, and in sentencing the defendant in an excessive manner on the rape conviction. We conclude that these issues are without merit and affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); George Morton Googe, District Public Defender; and Stephen Spracher, Assistant Public Defender (at trial and on appeal) for the appellant, James Raymond Snider.

Paul G. Summers, Attorney General and Reporter; Tara B. Hinkle, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, James Raymond Snider, was indicted for two counts of rape of a child less than thirteen years of age in violation of Tennessee Code Annotated § 39-13-522. After a two-day jury trial, the defendant was convicted of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. The jury assessed a fine of $50,000 for the rape conviction and $25,000 for the aggravated sexual battery conviction. The defendant was sentenced to twenty-two years incarceration for the rape and eight years for the aggravated sexual battery, to be served concurrently.

On appeal, the defendant raises the following four issues:

I. Whether the evidence is legally sufficient to support the guilty verdict against the defendant for rape of a child and aggravated sexual assault;

II. Whether the trial court erred by allowing the victim's mother, Martha Stoots, to testify as to statements made to her by the alleged victim, R.S.;[1]

III. Whether the trial court erred by ruling it irrelevant and, therefore, prohibiting the defendant from questioning Martha Stoots about sexual abuse committed against her in her childhood; and

IV. Whether the sentence imposed for the rape conviction was excessive.

After careful review of the record and the law, we affirm the judgment of the trial court.

## FACTS

The victim, R.S., was taken to the Care South Bemis Clinic by her mother, Martha Stoots.[2] Mary Ann Bond, a family nurse practitioner at the clinic, testified that she remembered seeing R.S. for the first time on May 11, 1998, with complaints of burning upon urination and drops of blood on tissue paper and in her underwear. Bond examined R.S.'s genital area and did not notice any vaginal discharge or blood. When she attempted to do a urinalysis, R.S. began to cry, and, at that point, her mother told Bond that she thought her daughter had been the victim of sexual molestation. When Bond conducted an external examination of R.S.'s genitals, she noticed a small abrasion around the clitoral area, which was not bleeding at the time. The child's hymen was intact and there were no abrasions around the hymen or the vaginal opening. From what she found during the examination, Bond testified that she could not tell what caused the abrasion in the clitoral area.

Upon cross-examination, Bond stated that the initial history she got from R.S. and her mother was that R.S. hurt herself on a tire swing. The references to sexual molestation did not come up until Bond attempted to get a urinalysis from R.S. At that point, R.S. became very upset, and her mother

---

[1] It is the practice of this court to use only the initials, rather than the name, of a child victim to protect the victim's identity.

[2] The medical records from the victim's visits to the clinic were admitted through the testimony of Joyce Springfield, one of the clinic's nurses.

then said she thought her daughter had been molested by a family friend. Bond testified that the abrasion she found on R.S.'s clitoral area could be consistent with a tire swing injury or sexual molestation, as this type of abrasion occurs when the clitoral area is stimulated or roughly rubbed.

The next witness called by the State was the victim's mother, Martha Stoots. She testified that R.S. was eight years old at the time of trial. Mrs. Stoots stated that R.S. is the oldest of her three children and that she, her husband, and the children live in her home. She identified the defendant as a family friend whom she had known for five or six years. The defendant was at her home a number of times and even slept there on occasion. In May 1998, the defendant had his computer in the Stoots' den.

Mrs. Stoots remembered that, on May 8, 1998,[3] seven-year-old R.S. was acting "funny" and kept going to the bathroom. Mrs. Stoots stood by the bathroom door and waited for R.S. to come out. When she entered the bathroom, Mrs. Stoots saw blood on the commode seat. She took R.S. into the bedroom and asked her what happened. After speaking with her daughter, Mrs. Stoots became concerned and called Mary Flowers, a friend and her husband's nurse practitioner.[4] Flowers came to the house and talked to and examined R.S. The child was subsequently taken to Care South Clinic.

Mrs. Stoots remembered that she saw the blood over a weekend and took R.S. to the clinic the very next Monday. She stated that she has noticed changes in her daughter since May 1998, in that the child has nightmares and is very scared and withdrawn. At the time of trial, the child was in counseling.

Over the hearsay objection of defense counsel, the trial court allowed Mrs. Stoots to testify on redirect as to what R.S. told her that caused her to suspect that the defendant had molested her daughter. Mrs. Stoots testified that R.S. told her that the defendant "caught her going out the den door, pulled her over to his chair and put his hands in her pants . . . and hurt her." Her daughter said that "it happened that day while [the defendant] was there on his computer." Mrs. Stoots did not question the defendant about this but reported it to the police. R.S. referred to the defendant as "Superman," which was his CB radio "handle."

The trial court then conducted a jury-out hearing to determine if the victim, R.S., was competent to testify. After the court was satisfied that she was competent to testify, R.S. was questioned by the State. R.S. stated that she was eight years old and was in the second grade. She identified the defendant, whom she calls "Superman," and stated that he was a friend of her family. The victim remembered that, on a weekend right before school was out the year before, she told her mother that "Superman" had stuck his finger in her "privates." She testified that she was in the den at her house when the incident occurred. Her mother, father, and brother were at home at the time,

---

[3] At a later point in her testimony, Mrs. Stoots stated that it was May 9, 1998, that she found blood on the toilet.

[4] On direct examination, Mrs. Stoots referred to Mary Flowers as a physician, but on cross-examination, it was revealed that Ms. Flowers is not a physician but a nurse practitioner.

but only the defendant was in the room with her. R.S. stated that she was standing up when the defendant touched her, and she had her clothes on. The defendant also put his hands inside her clothes and put his finger in her "privates." She stated that the defendant had done this before but did not know when that occurred. Although she did not cry, it hurt when the defendant did this to her. She stated that it also hurt the previous time the defendant put his finger inside her. The victim denied that the defendant touched her anywhere else on her body. She remembered talking to the doctor about this after she told her mother.

On cross-examination, R.S. testified that there was a tire swing in her yard but denied that she had ever hurt or scraped herself on the swing. R.S. testified that she was not roughhousing with the defendant when he hurt her. Upon further questioning by defense counsel, R.S. remembered telling the story about what happened that day many times and admitted that she really did not remember what happened in the den.

On redirect, R.S. stated that she was telling the truth and remembered the defendant putting his finger in her while in the den that day. She then testified that this had happened on five different days around the same time period. She denied touching the defendant in any way and stated that she was playing with him but not wrestling. She remembered telling her mother the day in question and remembered telling Lieutenant Arnold what had happened.

John Arnold, a lieutenant with the Madison County Sheriff's Department, testified that on May 12, 1998, he took the initial complaint from Mrs. Stoots and conducted an investigation, which included interviews with Mrs. Stoots, R.B., and the defendant. At trial, he identified the defendant and stated that he learned that the defendant's nickname was "Superman." Arnold interviewed the defendant at the sheriff's department on the day of the complaint as well. The officer stated that the defendant came in voluntarily to talk with the authorities.

After the interview, the defendant was taken into custody. Lieutenant Arnold read into the record the admonition and waiver form that was used to advise the defendant of his constitutional rights prior to taking a statement from him. The defendant's signature appeared on the form, which was witnessed by Lieutenant Arnold and Sergeant Anthony Heavner, and it was noted on the form that he signed it on May 12, 1998, at 3:15 p.m. Once he signed the waiver, the defendant gave a statement to the officers in the presence of Ms. Woodbury, the secretary in the criminal investigation division. Before signing the statement, the defendant was given an opportunity to review the statement and make any necessary changes.

The defendant's statement, which was given at 4:00 p.m. on May 12, was read into the record. In the statement, the defendant admitted putting his hand inside R.S.'s shorts and touching her vagina on the previous Friday or Saturday. He did not remember putting his finger inside her vagina but stated he could have done it accidentally. He also admitted touching her chest and putting R.S.'s hand on his penis outside of his clothes. The defendant admitted touching R.S. in her vaginal area on another occasion about two weeks prior to this incident, but he stated that he did not think he touched her under her clothes. He stated that he may have kissed her on the forehead while touching her. The defendant ended his statement by admitting that he knew what he was doing was

wrong and did not know why he did it. He expressed remorse and stated that he felt like he needed help. The defendant was arrested that day and charged with the crimes in the indictment. The defendant did not make any corrections to his typed statement and adopted it with his signature. No force or coercion was placed on the defendant to sign the statement, and he always had the option not to sign it. According to Lieutenant Arnold, the wording of the defendant's statement was not exactly, word for word, how he answered the questions asked but reflected what the secretary put down based on what she was hearing during the discussion.

Lieutenant Arnold denied that the defendant was promised a certain bond amount if he signed the statement. He stated that, if asked, the officers would tell a person charged with a crime that the judge would be told at arraignment that the defendant had cooperated but the officers had no authority to recommend a bond amount. The officer denied that the defendant was told that his bond might be $50,000-$100,000 without that recommendation, that he would sit in jail for up to two years if he could not make bond, or that he could get a reasonable bond if he signed the statement and could get out of jail to prove his innocence.

The last witness for the State was David Lloyd Stansell, a relative of the victim's family. He stated that he was at the Stoots' home on Saturday around Mother's Day in 1998. When he arrived at the home, Stansell saw the defendant's wrecker pulled over to the left side of the lot. Stansell had known the defendant for about six or seven months through visiting the Stoots' home. As Stansell walked through the front door, the defendant was sitting on the couch facing the television. R.S. was also in the room. Stansell noticed that the defendant looked "like he had seen a ghost, and he was real nervous. . . ." Stansell asked the defendant if something was wrong, and he replied "no." He identified "Superman" as the defendant.

On cross-examination, Stansell admitted giving a statement to the prosecutor in which he stated that the date of the incident was Friday, May 8, and not Saturday, May 9. Stansell said that he knew it was a weekend and that it was May 8, whether that was Friday or Saturday. The State rested its case.

The defendant testified in his own behalf. He stated that he drove a wrecker for Highway 70 Wrecker Service and worked 8:00 a.m. to 5:00 p.m. Monday through Friday and was on call at night, including weekends. He had known the Stoots family for as long as he could remember, and they were like a second family to him. According to the defendant, the Stoots children were like his little brothers and sister. He would wrestle with all three children, let them jump on him, and toss them on the couch, because Mr. Stoots' condition would not allow him to do that with the children. The children also played this way with James Burrows, who spent a lot of time at the house. When the defendant played with the children, he would hold them under their arms or by the legs. He denied ever touching any of the children in a sexual area.

The defendant stated that he had a computer in the Stoots' den, and the children would roughhouse with him there as well. On Saturday, May 9, 1998, the defendant recalled playing outside for thirty-five or forty-five minutes on a little golf course Mr. Stoots built in the backyard. Mr. and Mrs. Stoots then took the children with them to McKenzie's Market. When the Stoots

returned, the defendant had Mrs. Stoots take pictures of him and talked to Mr. Stoots outside before going back inside. Mrs. Stoots and R.S. were in the back bedroom, and the defendant told Mrs. Stoots he was leaving to run errands. He mailed some items, ate lunch, handled a couple of wrecker calls, and went home. Around 5:00 or 5:30 p.m., the defendant loaded his bowling ball in the wrecker and went back over to the Stoots' house. He estimated his arrival time at 5:15 or 5:30 p.m. A man known as "Fishing Dude" and his mother, Mary Flowers, were there. Others at the house included James Burrows, Pamela,[5] and a child who came with Mary Flowers. The defendant stayed for dinner and estimated that he left the Stoots' home around 9:15 to 9:45 p.m. to answer a call to a wreck scene. He did not remember anything different about the Stoots' behavior toward him between 5:30 and 9:00 p.m. The first time he heard about the allegations was when he was arrested on Tuesday.

The defendant described how he was summoned to the main office at work on Tuesday and told by Sergeant Heavner that he needed to go downtown with him. Upon arriving at the sheriff's department, the defendant was taken to Lieutenant Arnold's office who told the defendant they had to do some paperwork before he could tell him why he was there. Arnold read the defendant his rights and had him sign the form before he would talk to him about the allegations. The defendant signed the form between 3:00 and 3:20 p.m. When Arnold told the defendant that he had been accused of molesting R.S., the defendant initially denied it.

When asked by defense counsel why he had signed a confession only forty-five minutes later, the defendant explained that he was scared and had already waived his right to an attorney. When told that the Stoots alleged that the molestation occurred on a Friday, the defendant told the officers that they could check with his employer to see that he was not at work that day. According to the defendant, Lieutenant Arnold left the room at that point, possibly to talk to the Stoots, and Sergeant Heavner began talking to him. Heavner told the defendant that he needed to help himself, because he could sit in jail for a year or two before trial and would not be able to prove his innocence. The officer told the defendant that they [the officers] were trying to help him possibly get his bond set where he could make bond and prove that he did not molest R.S.

He stated that he was never told he was under arrest during the questioning, but he assumed he was when the officers read him his rights. He testified that he only signed the confession because he was afraid and wanted to get a lower bond so he could get out to prove his innocence. The defendant testified that he knew the statement was not true when he signed it. He denied doing anything sexual with the Stoots children.

On cross-examination, the defendant stated that Lieutenant Arnold read him his rights, and he identified his signature on the waiver form. The defendant did not remember being told that he could have an attorney but admitted that the form stated that he had that right. He also identified his signature at the end of his statement given to the officers. He agreed that the officers gave him the statement to review and that he made no changes to it. The defendant admitted telling the sheriff's

---

[5]During James Burrows's testimony, the jury was told that Pamela was Burrows's fiancee.

department the details of the incident that were contained in his statement but stated at trial that he had lied to get out of jail. At the time he signed the statement, he did not tell the officers that it was a lie or that he was doing so just to get out of jail.

When asked by the prosecutor to explain where he got the details in the statement, the defendant testified that Lieutenant Arnold had questioned him about the specifics that R.S. had told the officer, and he just agreed with what was said. The defendant remembered that Sergeant Heavner recommended a bond amount that the judge agreed to. He admitted that, in the year since his release from jail, he never went back to see the officers to change his statement or to tell them that he had lied. The defendant testified that R.S. had lied about the events in her trial testimony. The defendant stated he had repeatedly told the officers that he did not molest R.S. but decided to sign the waiver and statement anyway after being advised of his rights.

On redirect by defense counsel, the defendant stated that Lieutenant Arnold had "an attitude" that frightened him. According to the defendant, Sergeant Heavner did not seem menacing but seemed like he was trying to help the defendant. When his attorney took him through the various parts of his statement, the defendant denied volunteering the information and stated that he was merely responding to Arnold's specific questions based on details given by R.S. When asked why he told the officers that he had molested R.S. on another occasion approximately two weeks prior to the May 9 incident, the defendant testified that he made up the date after Arnold told him of the allegations of a second incident. He stated that he felt he had no choice but to sign the statement, because he thought he would have to stay in jail until the trial if he did not sign. He testified that he offered to take a polygraph test, which was declined. The defendant admitted that he never asked his attorney to change his statement but pled not guilty.

The final witness for the defense was James Burrows who had known the Stoots for about four years. Burrows remembered being at the Stoots' house on the Saturday before Mother's Day, May 9. He arrived in the afternoon between 3:00 and 4:00 p.m.. "Fishing Dude," Mary Flowers, Mr. and Mrs. Stoots, and the children were all there. Prior to the alleged molestation, Burrows stated that he had a good relationship with the Stoots children and would roughhouse with them. Burrows remembered seeing the children around the defendant that day and did not notice anything unusual in their actions. However, he did remember the Stoots telling him on Saturday that they had something to tell him that would "blow [his] mind." When the defendant came back to the house after Burrows arrived, no one acted differently toward him.

The State called Sergeant Anthony Heavner as a rebuttal witness. He recalled being asked by Lieutenant Arnold to sit in on the defendant's interview as a witness in May 1998. Heavner was present when the defendant's rights were read to him and witnessed the execution of the waiver of rights. Heavner testified that the defendant at first denied committing the crime but then admitted that he did it. The officer denied that any promises were made to the defendant in exchange for the statement, nor was the defendant told he could get out of jail or get less of a sentence by signing. According to Heavner, the statement was voluntarily given by the defendant and was given to him to review before he signed it. The defendant did not indicate to the officers that he wanted to make

any changes to the statement or that it was not true; nor did he come back in the next year to say it was not true.

On surrebuttal by defense counsel, Heavner remembered that the defendant stated, "I could have accidentally, but it was not intentional" in response to a question asking if he could have accidentally put his finger in R.S.'s vagina. Heavner also denied that he provided information about bond amounts, but he remembered telling the defendant that the court would be advised of the defendant's cooperation when bond was set. The officer testified that he told the defendant about the factors that were taken into account by the court in setting bond, but the defendant's conclusion that he would get a lower bond by signing the statement was the defendant's own conclusion.

## ANALYSIS

## I. TESTIMONY OF MARTHA STOOTS

The defendant raises two issues of error in the trial court's handling of Martha Stoots' testimony. Because this testimony is potentially part of the evidence we will look at in assessing the sufficiency of the evidence, we will discuss these two issues first.

### A. R.S.'s Statements

The defendant argues that the trial court erred in admitting Mrs. Stoots's testimony recounting what her daughter, R.S., told her about being fondled by the defendant. In questioning Mrs. Stoots during cross-examination, the defense appears to have inadvertently elicited testimony that R.S. accused the defendant of molesting her. The record shows that the defendant was attempting to ask for a date when Mrs. Stoots' suspicions arose when he received the answer about R.S.'s statements. The dialogue between the defense attorney and the witness follows:

Q. So you didn't notice anything until Saturday. That's what you're saying now.

A. I seen the blood Saturday.

Q. And when did you start to suspect that it was James Snider that had done something to her?

A. When she [R.S.] told me.

The defendant did not voice a formal hearsay objection, but he did say, "I didn't ask that. I asked you when did you start to suspect. . . ." At this point, the State objected that the question was asked and answered. The judge sustained the objection, and the testimony that R.S. made a statement about the defendant was allowed into evidence.

-8-

On redirect, the prosecutor asked the following questions:

Q.    Mrs. Stoots, Mr. Spracher asked you why your suspicions were raised on Mr. Snider, and you said it was because of what she told you. Was "she" being [R.S.]?

A.    Yes.

Q.    What'd she tell you?

At this point, the defense objected, based on the fact that the witness's answer would be inadmissible hearsay. Because the defense had asked Mrs. Stoots for the basis of her suspicions on cross-examination, the trial judge allowed the testimony on redirect. The witness then testified:

A.    She [R.S.] told me that James Snider caught her going out the den door, pulled her over to his chair and put his hands in her pants.

. . . .

He pulled her over to his chair and put his hands in her pants and hurt her.

In its brief, the State argues that the defense not only opened the door to this testimony on cross-examination by asking the witness what caused her to suspect the defendant but also contends that Mrs. Stoots's testimony was admissible as an exception to hearsay, an excited utterance.

A trial court's decision to admit evidence and determine the scope of redirect will not be overturned on appeal absent an abuse of discretion. State v. Bigbee, 885 S.W.2d 797, 806 (Tenn. 1994); State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999). After carefully reviewing the record, we conclude that the trial court did not abuse its discretion and affirm the trial court's admission of the testimony regarding what R.S. told her mother about the molestation.

On redirect, the defendant did voice an objection to Mrs. Stoots's testimony regarding the content of R.S.'s statements on hearsay grounds. Because the trial court found that the defendant had raised this issue on cross-examination, the State was allowed to further explore R.S.'s statements to her mother as within the scope of redirect.

The purpose of redirect examination is to clarify the witness's testimony. See Chearis, 995 S.W.2d at 645. Although the Tennessee Rules of Evidence do not address the scope of redirect, it is well-settled in this state that redirect can broach topics raised on cross-examination, even when the particular matters were not raised during direct examination. State v. Baker, 966 S.W.2d 429, 433 (Tenn. Crim. App. 1997). Because no hearsay objection was made by the defense on cross-examination to Mrs. Stoots's testimony referring to what R.S. told her, the trial court did not abuse its discretion in allowing the State to explore R.S.'s accusations of molestation on redirect.

Even if the defense had not "opened the door" to this testimony on cross-examination, Mrs. Stoots's statements about what R.S. told her would have been admissible for other reasons. The defendant correctly points out that the "fresh complaint" doctrine has been abandoned in Tennessee in cases involving child sexual abuse; however, this type of statement from a child victim is admissible as substantive evidence, if it satisfies some hearsay exception, and corroborative evidence, if it qualifies under the prior consistent statement rule. State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995). Tennessee Rule of Evidence 803(2) carves out an exception to hearsay for statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale for admitting these "excited utterances" is that reflection and fabrication are not likely when a declarant spontaneously makes a statement in response to an exciting event. State v. Gordon, 952 S.W.2d 817, 819 (Tenn. 1997) (quoting Cohen, Paine & Sheppeard, Tennessee Law of Evidence § 803(2).1 at 532 (3d ed. 1995)). Additionally, such a statement is usually made when an event is still fresh in the declarant's mind. Id. Mrs. Stoots's daughter said that the abuse had occurred earlier that same day when she saw the blood on the toilet seat.

There are three requirements for hearsay to be admissible as an excited utterance: (1) there must be a startling event or condition; (2) the statement must be related to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement of the event or condition. Gordon, 952 S.W.2d at 820. Although the startling event is usually the act upon which the legal controversy is based, such as an assault, a subsequent startling event that is related to the prior event can also produce an excited utterance that falls within the exception. Gordon, 952 S.W.2d at 819. For example, a beating victim's statement could be an excited utterance related to the startling event of seeing the defendant's picture, even when a significant amount of time has lapsed between the beating and the victim's seeing the picture. Id. (citing United States v. Napier, 518 F.2d 316 (9th Cir.), cert. denied, 423 U.S. 895, 96 S. Ct. 196, 46 L. Ed. 2d 128 (1975), in which the victim did not see the picture until after hospitalization). A suspect returning to the scene of a crime can also be a startling event that spawns excited utterances from a victim. Id. (citations omitted). A child rape victim's painful urination after going home and taking a bath has also been held to be a startling event that spawned an excited utterance. Gordon, 952 S.W.2d at 821.

The second requirement, that the statement relate to the startling event, is very broadly construed by our courts, because the statement can describe all or part of the event or the impact of the event on the declarant. Id.

The third requirement, that the declarant be under the stress or excitement of the startling event, relates to the reliability of the statement and the concern that the statement be free from fabrication or reflection. The time interval between the startling event and the statement is only one consideration in determining whether the statement was made under stress or excitement. Id. Other factors considered by the court are the nature and seriousness of the event or condition; the declarant's circumstances, including age and physical or mental condition; and the nature of the statement itself in indicating the presence or absence of stress or excitement. Id. (quoting Tennessee Law of Evidence § 803(2).2, at 534).

In the present case, R.S.'s statements to her mother implicating the defendant as the molester qualify as an excited utterance. The startling event in this case arose when blood appeared on the commode as the victim was attempting to urinate, even though this did not occur immediately after the molestation but did occur the same day. The young victim's statements to her mother were the result of seeing the blood on the toilet; thus, the statements made to her mother were related to the startling event. The record is not well-developed on the extent of R.S.'s stress level when she saw the blood, but her mother testified that she was acting "funny" when she was going in and out of the bathroom, and Nurse Bond testified that R.S. became very upset when she tried to get a urine sample at the clinic on Monday. Considering that the defendant was a close family friend and the young age of the victim, it is not surprising that R.S. would not have acted overly excited at the time that she made the statements to her mother. As our supreme court has recognized, child victims commonly are reluctant to report sexual offenses and may be unaware of the wrongful nature of the conduct or that it is not normal behavior for an adult. Livingston, 907 S.W.2d at 395. However, the time interval between the appearance of the blood on the toilet and the victim's statements in the bedroom was very brief, and whatever stress she experienced from seeing the blood would still have been present when she told her mother what the defendant had done to her. See, e.g., Gordon, 952 S.W.2d at 821 (child rape victim still under stress of startling event when made statements to her parents in bedroom a few minutes after painful urination). Therefore, R.S.'s statements to her mother identifying the defendant as the perpetrator were properly admitted into evidence by the trial court.

### B. Mrs. Stoots's Childhood Abuse

The defendant's next assignment of error regarding Mrs. Stoots's testimony is that the trial court should have allowed the defendant to question Mrs. Stoots concerning sexual abuse she experienced as a child. In a bench conference, defense counsel explained to the judge that he was trying to show that Mrs. Stoots had projected her own childhood fears onto her daughter and that R.S. was just responding to her mother's fears. The trial judge excluded this evidence as irrelevant. From our review of the record, we cannot conclude that the judge abused his discretion in excluding this evidence.

Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." While a mother's own fear may be projected onto her child, the defense did not offer an expert witness to connect Mrs. Stoots's childhood experience with R.S.'s accusations, which would be required to make such a psychological connection. The defendant was allowed to question Mrs. Stoots about discussions she had with R.S. about the molestation and what she had told her about abuse prevention, which were relevant. Absent any connection between Mrs. Stoots's childhood experiences and her daughter's accusation against the defendant, this evidence has no bearing on the issues in the case and does not make any of the issues more or less probable than without that testimony.

Even if the trial court erred in excluding this evidence, any error was harmless. Considering the fact that the defendant admitted molesting the victim in a statement to police, along with the

testimony of the victim and her mother concerning the molestation, any testimony about Mrs. Stoots' childhood abuse would not likely have changed the jury's verdict.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant contends that no rational trier of fact could have found him guilty beyond a reasonable doubt based on the evidence produced at trial. He specifically points to the uncertainty of R.S.'s testimony as to what happened and the fact that R.S. had talked to her mother numerous times about the incident. According to the defendant, the victim was "brainwashed" into accusing the defendant of sexual abuse. He also points to the inconsistencies in Mrs. Stoots' behavior, in that she served him dinner after she was convinced that he had molested her daughter and did not take her daughter to a clinic for two days after the alleged abuse. Upon our review of the record, we conclude that the evidence was sufficient to support the defendant's conviction.

The jury returned a guilty verdict against the defendant for one count of rape of a child less than thirteen years of age and one count of aggravated sexual battery. Tennessee Code Annotated § 39-13-522 (1997) defines rape of a child as follows:

> (a) Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age.

"Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (1997).

Aggravated sexual battery is defined in Tennessee Code Annotated § 39-13-504 (1997) as:

> (a) Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> . . . .
>
> (4) The victim is less than thirteen (13) years of age.

"Sexual contact" is defined in § 39-13-501(6) as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification."

The defendant is initially cloaked with a presumption of innocence, but this presumption is lost following a jury verdict. Thus, on appeal, the defendant has the burden to prove that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We must affirm the conviction, unless the evidence at trial was so deficient that no rational trier of fact could have found all of the essential elements of the convicting crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). This applies to convictions based on either direct or circumstantial evidence or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990). In determining the sufficiency of the evidence, we do not reweigh the evidence or substitute our own inferences for those of the jury. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In addition, we give the strongest legitimate view of the evidence and all reasonable inferences to the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368 (1993). With these principles in mind, we turn to the evidence.

The issues raised by the defendant concerning inconsistent testimony are issues of witness credibility that we will not disturb on appeal. The jury simply did not believe the defendant's version of the events and credited the testimony of the State's witnesses. In addition, there was other significant evidence that pointed to the defendant's guilt. The statement that the defendant gave to police and signed was detailed and comported with what R.S. told her mother and testified to at trial. In the statement, he admitted touching R.S.'s vagina and putting her hand on his genitals on one occasion and putting his hand on R.S.'s vagina over her clothes on a second occasion. He also admitted that his finger may accidentally have gone in her vagina when he put his hand in her shorts. The jury apparently did not believe the defendant's explanation that he signed the statement admitting to child sexual abuse to get out of jail in order to prove his innocence. Furthermore, Nurse Bond testified that the injury to R.S.'s genitals was consistent with the type of contact that the defendant admitted to having with her. The defendant was allowed to vigorously cross-examine all of the State's witnesses, and he gave his version of the facts in his testimony at trial. Giving the State the strongest legitimate view of the evidence presented, a rational juror could have found beyond a reasonable doubt that the defendant intentionally touched and put his finger inside R.S.'s vagina (child rape) and touched her vagina two weeks earlier over her clothing (aggravated sexual battery). We cannot find that the evidence was so deficient that it did not support the verdict. This issue is without merit.

## III. SENTENCING

In reviewing a sentence, we conduct a *de novo* review with a presumption of correctness of the trial court's findings. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Although the basis stated for the trial court's findings was not detailed, we conclude that the trial court properly considered the appropriate factors, and the presumption of correctness applies. Furthermore, the defendant bears the burden of proving that the sentence is improper. State v. Hunter, 926 S.W.2d 744, 748 (Tenn. Crim. App. 1995), perm. app. denied, (Tenn. 1996).

In conducting our *de novo* review of the sentences, we must consider: (1) the evidence received at trial and at the sentencing hearing; (2) the presentence report; (3) sentencing principles; (4) arguments for sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating and enhancing factors; (7) the defendant's statements regarding sentencing; and (8) the defendant's potential, or lack thereof, for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102, -103, -210 (1997); State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

For sentencing purposes, the defendant was classified as a Range I, standard offender. The Range I sentence for child rape, a Class A felony, is not less than fifteen nor more than twenty-five years. Tenn. Code Ann. § 40-35-112 (a)(1) (1997). The presumptive sentence for a Class A felony is in the midpoint range, which is then adjusted according to the enhancing or mitigating factors. § 40-35-210(c)-(e) (1998). On May 7, 1998, the sentencing act was amended to mandate that the trial judge set the sentence at or above the midpoint when only enhancement factors are present. The previous version of this statute made increasing the sentence discretionary. Since the rape took place on May 8 or 9, the rape sentence falls under the new amendment.

The Range I sentence for aggravated sexual battery, a Class B felony, is not less than eight nor more than twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (1997). A Class B felony has a presumptive sentence of the minimum in the range and is likewise adjusted for enhancing or mitigating factors. § 40-35-210(c)-(e) (1997). Since the count involving the aggravated sexual battery occurred before May 7, 1998, the previous version of the sentencing statute applies, which allows the judge to use his or her discretion, rather than making it mandatory, to increase the sentence when only enhancing factors are present. The defendant received the minimum sentence for aggravated sexual battery, and, for obvious reasons, he is not challenging the length of this sentence.

The presentence report presented at the hearing revealed that the defendant had a 1986 conviction for theft under $500 and a 1995 conviction for criminal impersonation. He had a twelfth grade education and was employed until he was jailed. The victim's impact statement was also included. Mrs. Stoots testified at the hearing that her daughter has become very withdrawn, scared, depressed, and anxious since the incident. She also has trouble sleeping. Mrs. Stoots further testified that the family is heartbroken, and her husband, who is disabled, has panic attacks and stays

closed up in the house. Mrs. Stoots stated that she has become very emotional. She could not recommend any possible punishment for the defendant that would make her feel better.

The trial court sentenced the defendant to twenty-two years and a fine of $50,000 for the rape of a child and eight years and a fine of $25,000 for the aggravated sexual battery. In sentencing the defendant as a Range I standard offender at 100%, the court applied enhancing factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," and enhancing factor (7), that "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement," to the rape sentence. Tenn. Code Ann. § 40-35-114(1), (7) (1997). The court found that neither mitigating factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury," nor an unspecified mitigating factor, that the defendant cooperated with police by giving a statement, applied. Tenn. Code Ann. § 40-35-113(1) (1997). The factor concerning cooperation with the police falls under the catch-all factor (13), under which the court can consider any other factor consistent with the purposes of the sentencing act. Tenn. Code Ann. § 40-35-103; -114(13) (1997).

### A. Enhancing Factor (1)

The defendant argues that the trial court should have given little weight to enhancing factor (1) regarding the defendant's previous history of criminal behavior, since the offenses involved were minor misdemeanors. The trial court only enhanced the sentence two years above the presumptive midpoint of twenty years on the child rape conviction using the two enhancing factors it found. Considering that the court did not enhance the aggravated sexual battery sentence, even though factor (1) applied, it appears that the trial court gave little weight to the defendant's previous history of misdemeanors on either charge. The court could have properly given greater weight to the defendant's misdemeanor convictions, as this court has previously allowed relatively minor and unrelated criminal acts, such as driving-related offenses, to be considered in enhancing a sentence. State v. Walde, No. 03C01-9603-CC-00109, 1997 WL 789964, at *10 (Tenn. Crim. App., Knoxville, Dec. 23, 1997), perm. app. denied, concurring in results only (Tenn. 1999) (citations omitted). In any event, it is proper for the trial court to enhance a sentence for prior misdemeanor convictions, and we see nothing in the record that would cause us to disturb the trial court's application of this factor. See State v. McKnight, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994), perm. app. denied, (Tenn. 1995).

### B. Enhancing Factor (7)

The defendant further challenges the trial court's application of enhancement factor (7), that the offense was committed for pleasure or excitement. This factor is not applicable to the aggravated sexual battery conviction, since it is already contained in the essential elements of the offense.[6] State

_____

[6]Tenn. Code Ann. § 39-13-504(a) defines aggravated sexual battery as involving unlawful sexual contact. "Sexual contact" under our statutes involves intentional touching that "can be reasonably construed as being for the
(continued...)

v. Kissinger, 922 S.W.2d 482, 489 (Tenn. 1996). On the other hand, rape involves sexual penetration, which has no motive component under our statutes. Therefore, enhancement factor (7) can be applied to the rape conviction if there is evidence in the record to support its application. Our review of the record shows that there is. The defendant's own statement to police indicated that he touched the child's chest, kissed her, and put her hand on his penis while touching her vagina. These are clearly actions showing arousal or pleasure-seeking. The trial court correctly applied factor (7) to the rape conviction.

### C. Mitigating Factor (1)

The defendant alleges error by the trial court in refusing to apply mitigating factor (1), that the criminal conduct did not cause or threaten serious bodily injury. We agree with the trial court that this mitigating factor was inapplicable. The victim testified at trial that the defendant hurt her when he inserted his finger in her vagina, and the child's mother testified that the victim has become scared, depressed, and anxious since she was molested by the defendant. The child was still in counseling at the time of trial. There was blood from the victim on the toilet seat, although it was not clearly connected to either the victim's bladder infection or the molestation, and there was a small laceration in the victim's vaginal area that was consistent with digital penetration. Our courts have previously recognized that the rape of a child is always physically and mentally injurious to the victim, and injuries somewhat similar to these have been held to be serious bodily injury in child sexual abuse cases for the purposes of the statute. See Kissinger, 922 S.W.2d at 487; State v. Edward Earl Huddleston, No. 02C01-9706-CC-00228, 1998 WL 67684, at *3 (Tenn. Crim. App., Jackson, Feb. 20, 1998), perm. app. denied, (Tenn. 1998); State v. James Dison, No. 03C01-9602-00051, 1997 WL 36844, at *18 (Tenn. Crim. App., Knoxville, Jan. 31, 1997), perm. app. denied, (Tenn. 1997). As to the trial court's finding that the difference in size between the defendant and the victim threatened bodily harm, we have not found any case law supporting such a finding and decline to so hold in this case.

We also note that this court has actually enhanced sentences for rape and aggravated rape of a child for psychological injuries pursuant to enhancement factor (6), which allows enhancement when the injury to the victim is particularly great. State v. Hunter, 926 S.W.2d 744, 749 (Tenn. Crim. App. 1995), perm. app. denied, (Tenn. 1996). In Hunter, the defendant's sentence was enhanced using factor (6) for penetrating his eight-year-old daughter's vagina with his finger, when there was evidence presented at trial that the child was depressed and suffered from post-traumatic stress disorder. Id. Considering the testimony of Mrs. Stoots as to the changes in R.S.'s behavior and her need for counseling after the molestation, the trial court could have enhanced the sentences using factor (6) as well as the other factors it used, which would have effectively cancelled out any effects of mitigating factor (1).

### D. Mitigating Factor (13)

---

[6](...continued)
purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (1997).

The defendant's final argument that his sentence should have been mitigated because he cooperated with authorities is likewise without merit. The trial court was bothered by the defendant's testimony that the statement he gave police admitting to the molestation was not accurate. The court noted:

> I don't believe in all fairness today that that should be considered as
> a mitigating factor. Otherwise, the Court would be finding that you
> can tell the police what you want to one day and change it the next
> and yet take credit for it when it comes to sentencing purposes, and
> that just does not seem, the Court finds, to be sound logic.

We agree with the trial court's reasoning and find that it did not abuse its discretion in refusing to apply this factor to mitigate the sentences. Having found that the trial court correctly applied two enhancing factors and no mitigating factors to the child rape sentence, we affirm the trial court's twenty-two-year sentence for this offense.

## CONCLUSION

Based upon our review, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE