IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 13, 2011 Session

**STATE OF TENNESSEE v. JONATHAN KYLE HULSE**

**Appeal from the Criminal Court for Washington County**
**No. 35271    Robert E. Cupp, Judge**

_____

**No. E2011-01292-CCA-R3-CD - Filed March 19, 2013**

_____

The Defendant, Jonathan Kyle Hulse, was found guilty by a Washington County Criminal Court jury of aggravated rape, a Class A felony; especially aggravated kidnapping, a Class A felony; and unauthorized use of a vehicle, a Class A misdemeanor. See T.C.A. §§ 39-13-502 (2010) (aggravated rape), 39-13-305 (2010) (especially aggravated kidnapping), 39-14-106 (2010) (unauthorized use of a vehicle). He was sentenced as a violent offender to twenty-nine years for each of the Class A felonies and to eleven months and twenty-nine days for the misdemeanor. The trial court ordered that the felony convictions be served consecutively, for an effective fifty-eight-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support the especially aggravated kidnapping conviction, (2) his dual convictions for aggravated rape and especially aggravated kidnapping violate due process principles, and (3) the trial court erred in admitting evidence of the deceased victim's statements about the crimes as excited utterances. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

T. Craig Smith, Johnson City, Tennessee, for the appellant, Jonathan Kyle Hulse.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Tony Clark, District Attorney General; and Erin D. McArdle and Dennis Dwayne Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

At the time of the trial, the victim was deceased. Emily Upright testified that she was familiar with the Defendant because she saw him in her neighborhood around the time of the crimes. She thought he may have been staying with his father, who lived in the neighborhood. She said the Defendant's father's residence was across the road and four trailers away.

Ms. Upright testified that after midnight on August 29, 2008, her dog began barking and that she heard a sound like a truck driving into her trailer. She and her brother went outside and found the naked victim on the ground near her porch about one-half under her trailer. She said that her trailer's paneling was pushed under and that it had not been this way previously. She said that the naked Defendant stood about fifteen feet away facing her and the woman on the ground but that he fled in the direction of his father's trailer when she looked at him. She said the victim was screaming and appeared to have been stabbed several times. Regarding the victim's face, Ms. Upright said, "I've never seen anybody look that bad in my life." She said the victim's injuries appeared fresh. She gave the victim a blanket. The victim could not move but was shaking, was weak and in shock, and had lost a large amount of blood. She said the victim stated that she had been raped and that the rapist cut her hair. Ms. Upright said the victim acted as if she thought the Defendant was going to kill her. After Ms. Upright called 9-1-1, the police and an ambulance arrived.

Ms. Upright testified that it was dark outside when she encountered the victim and saw the Defendant. She said she opened a window after it was light outside and saw a boxcutter in the front yard in front of the window. She notified the police, who responded to the scene. She said that the boxcutter was not her brother's or hers and that tools in her house were locked away because she had a child. She identified photographs of the damaged underpinning of her trailer, towels she gave the victim, and the victim's blood on her steps.

On cross-examination, Ms. Upright testified that she sometimes saw the Defendant near another trailer when she went to the mailbox. She estimated that she saw him fifteen to twenty times in the two months before the crimes. She said he played basketball with his brother outside. She said that they waved at each other and that the Defendant seemed pleasant. She did not know if the victim injured her face on the underpinning but said the victim stated she had been stabbed in the stomach. She said the victim stated that she did not know who stabbed her because the victim had just met him. She said the victim pointed to the Defendant's father's trailer as the location of the crimes. She said that the victim stated that the man cut her hair and that the victim's hair was jagged. She acknowledged that she did not identify the Defendant that night and said she was not sure. She said that after she calmed down, she concluded that the man she saw was the Defendant. She acknowledged

-2-

that the victim never made a statement that she believed the Defendant would kill her. She acknowledged that the lighting was not good that night. She said that she had her house lights, porch light, and some street lights were lit.

On redirect examination, Ms. Upright testified that the Defendant ran as soon as she and her brother opened the door. She said the victim stated that she had driven her car to the trailer park. She identified a photograph of the victim depicting the condition of the victim's face when Ms. Upright found her.

Johnson City Police Patrol Officer Nigel McQueen testified that he responded after midnight on August 29, 2008, to a call regarding a rape. He said that when he arrived, the victim was wrapped in a blanket and that both were covered in blood. He described her as "balled-up." He said that she was screaming loudly that she had been raped. He said it was obvious she had been physically assaulted with a sharp object. He could not tell whether she was wearing any clothes. He spoke with her briefly until the medical personnel arrived. The victim told him that she drove to the trailer park in her blue Chevrolet Cavalier with her assailant. The officers searched for the car, but it was not in the neighborhood and a "BOLO" was ordered.

On cross-examination, Officer McQueen testified that he did not recall whether he was told to respond to a rape or an assault. He said that when he arrived, a crowd had gathered. He said the victim did not identify by name the person she said raped her. He said that to his knowledge, she did not make any statements about being cut or stabbed or about her hair being cut. He said he did not pay attention to the underpinning on Ms. Upright's trailer. He said that to his knowledge, the victim did not make any statements about hitting or falling into the underpinning. He had very limited contact with the Uprights but did not recall them saying anything about the victim's falling into the trailer. He said it took about ten minutes for him to arrive at the scene. On redirect examination, Officer McQueen stated that his responsibilities at the scene did not include taking full statements and that the investigative unit would have been responsible for taking statements.

Washington County Sheriff's Deputy David Cate testified that on August 29, 2008, around 1:00 a.m., he was responding to a call regarding a prowler when he found the Defendant sitting alone on the side of the road in a blue Chevrolet Cavalier. He checked the Defendant's identification but did not recall what the Defendant said. He said that he smelled alcohol on the Defendant and that he took the Defendant into custody. He said that when they "ran the tag [number for the Cavalier,] . . . it came back to switched tags[.]" He gave the VIN to another officer, and they determined that the car was not registered to the Defendant. He identified a photograph of the Cavalier. He learned later that Johnson City authorities wanted the Defendant for rape, and Officer Nikki Salyer transported the

Defendant to the police department. He identified the Defendant as the person he saw in the Cavalier.

On cross-examination, Deputy Cate testified that he saw the Defendant in the Cavalier near the house where a prowler had been reported. He said that the report was of a white male without a shirt but that there was no description of a car.

Washington County Sheriff's Investigator Nikki Salyer testified that she was working as a patrol officer on August 29, 2008, when she and another officer responded to a call regarding a prowler. She said she spoke with the people who made the call. When Deputy Cate notified her that he found a person, she left the house to assist him. She identified the Defendant as the person whom Deputy Cate had detained. She thought that the Defendant told them he was out of gas and that he knocked on the door to try to get help. She said the Defendant was wearing pants but no shirt. She said that they learned that the Defendant was a suspect in a crime in Johnson City and that she took him to the Johnson City Police Department.

Johnson City Police Investigator Bob Odom testified that he began working on the case the next morning and went to Ms. Upright's trailer to collect evidence. He said there was blood on the steps, bloody towels on the porch and in the front yard, and a boxcutter in the grass. He photographed the items and collected them. He identified the photographs he took and the evidence he collected. He said the boxcutter's blade was not protruding and did not recall whether the boxcutter had a blade when he collected it. On cross-examination, he stated that he spoke with the Uprights when he collected the evidence but did not take statements from them. He did not know whether testing was done on the boxcutter or the towels.

Dr. Illuri Reddy testified as an expert in emergency medicine. She said the victim was brought to the emergency room after midnight on August 29, 2008. She said the victim was covered in blood from head to toe. Dr. Reddy said that the victim had bruises on the left side of her face, that her eyelid was almost closed, and that she cried and was anxious. She said she asked the victim what happened. She said the victim told her that she gave a friend and the friend's friend a ride. She said the victim dropped off her friend and took the friend's friend home. She said that she helped him get his groceries to the door and that when she turned to go to her car, he pulled her into the house by her hair, beat her, and raped her.

Dr. Reddy testified that she examined the victim. She described the victim's injuries: extensive bruising of the face, especially the left side, left eye, left side of the forehead, and middle of the forehead and nose; cuts on the thighs; hemorrhage inside the left eye; and bruising around the upper thighs and vaginal area. She identified photographs of the victim's

injuries. She said she ordered a CAT scan to determine if the victim had head or face fractures. She said the scan revealed multiple fractures around the eyes and broken nasal bones. She said the victim had a cut that required stitches. She said a rape kit was performed. She said the victim received pain medication and was admitted to the hospital for observation. She said the victim was 5'1" or 5'2" and weighed 110 or 115 pounds. She said her diagnoses were: physical and sexual assault, multiple facial fractures, head injury, and multiple lacerations.

On cross-examination, Dr. Reddy testified that none of the evidence collected for the rape kit was retained by the hospital and that everything collected was sent away. She said that bruising on the upper thighs could indicate forceful or vigorous sexual intercourse. She said that most of the blood on the victim's body probably came from the victim's face because facial cuts bleed a lot. She said that facial lacerations could be caused by a blow from a fist. She said that a patient's history of the injury is often used to determine how facial lacerations were inflicted. She said that after she asked the victim what happened, the victim said, "I was beat up." She asked the victim who injured her, and the victim gave her an account of the events that resulted in her injuries. She said the victim could not name her assailant but identified him as a male friend of a female friend.

Dr. Reddy testified that she was unaware if the victim was taking Valium and Lortab. She said it would have been difficult to determine if the victim was under the influence because the victim was very agitated. She said she ordered a routine drug test, but none was completed because the victim was unable to give a urine specimen. She said a rape kit was used to determine whether a patient had been involved in sexual intercourse and to obtain a DNA profile of the other person.

Johnson City Medical Center Nurse Gail Vestal testified that she assisted Dr. Reddy in the emergency room on August 29, 2008, when the victim was treated. She described the victim as tearful, upset, and scared. She said the victim was covered in blood and had a blanket covering her. She said the victim had an avulsion on her head above her eye. She said a rape kit involved pubic combings, collecting underwear, a pelvic exam, collecting a cervical and vaginal sample with a swab, collecting a sample from the anal area if the patient's history required it, and inspecting for injuries. She said the victim was frightened and cried the entire time, three to four hours.

On cross-examination, Nurse Vestal testified that the victim was unable to provide a urine sample. She said that a blood sample was taken if a doctor ordered it. She said that drug tests were given based on the doctor's evaluation of the patient.

The victim's medical records were received by stipulation as an exhibit. They reflect that the victim recounted details of the crimes to several physicians who recorded her statements in their reports. One of these reports states:

> The patient reports that they went out the day on the 29th on her way back home, a friends of hers, Jerry, and another male that was a friend of Jerry's that she basically did not know, asked her to give them a ride back home. The patient agreed to do so and first she dropped her friend Jerry at his house, and then went ahead and took the other man to his house. When they got to the last guy's house, he asked her to help with some groceries, bringing in next to his door's apartment. She did so and at that moment he grabbed her around her neck and threatened to kill her. He pushed her inside the house and asked her to take her clothes off, threatening her with a knife, and stated that he would kill her if she did not do so. The patient was subsequently raped by this guy who beat her up with his own hands and hitting her head toward the concrete. The patient was able later on to leave the man's house after the sexual assault and asked a neighbor for help.

A second report states:

> Patient . . . was admitted last night after [an] assault, including a sexual assault. She reports running out of a house, being captured, and drug back down by her feet, and striking her face on cement.

Dr. Reddy's emergency room notes state:

> As per [patient] was in Keystone area with a friend who wanted her to give a ride to alleged assailant. [Patient] states she took the assailant to his trailer & walked him to it & turned to return to her car when he pulled her back inside by her hair & beat h[er] and raped her [illegible] away & ran to the neighbors & called 911[.]

Another report states:

> [The victim] stated that she picked up by assailant and one other male to give a ride at home when the victim arrived at assailant trailer they pushed her down so she fell down and hit her face on the step although she denies any loss of conscious level at that time and after that they pushed her inside and she alleged that they did the physical and sexual assault with her.

Johnson City Police Investigator Teresa Campbell testified that she was working as a patrol officer on August 29, 2008, when she was dispatched to respond to an alleged rape. She was assigned to be the primary investigator. She and Investigator Richardson went to the emergency room and spoke with the victim. She said that a rape kit was performed while she was there and that she waited outside the examination area for the rape kit. She said she assisted Investigator Richardson take photographs of the victim.

Investigator Campbell testified that she and Investigator Richardson went to the Defendant's trailer. She said there were several pieces of mail addressed to the Defendant in a drawer in the bedroom. She said they took photographs inside the trailer. She said there were bedrooms on either end of the trailer with an open living room and kitchen near the front door. Using photograph exhibits, she pointed to blood on a mattress and a clump of reddish-blonde hair on a comforter. She said that the clump of hair resembled the victim's hair. She said a pair of jeans that "had been shucked inside-out" with underwear inside them and a pair of tennis shoes were on the floor in the bedroom. She said a pair of men's boxer shorts were also in the bedroom. A bottle of lubricant was on the side of the bed. She said that a bra was on a tennis shoe and that both were underneath a blanket. She said that samples were collected of wet blood on the mattress. She identified as exhibits the clothing and lubricant collected in the Defendant's bedroom. She identified mail that contained the Defendant's return address using the address of the trailer.

Investigator Campbell identified a photograph depicting the victim's car, which the Defendant had driven. She said that the car had blood on the driver's door armrest and handle. She collected samples from the car. She said she collected a buccal swab sample from inside the Defendant's jaw.

Investigator Campbell testified that she interviewed the Defendant at about 4:00 a.m. at the police department. She said the interview was recorded. She thought he wore jeans and a t-shirt. She said that she collected the Defendant's jeans as evidence and that there were specks of blood on them.

The video recording of the Defendant's interview was played. In it, the Defendant said the victim approached him and a couple he knew in a bar and that she left with him voluntarily after he asked if she wanted to go to his house to drink beer. He identified the other couple as Crystal Chadwick and her boyfriend, David. He said he drank eight beers at the bar. He said the victim drank one or two beers at his house. He said that after he told her he would buy her some crack, she was "all over" him. He said he pretended to make a telephone call to have someone bring crack to the house. He said that she got on top of him as he sat in a recliner and that he suggested they go to the bedroom, where they had sex. He said that afterwards, he told her he was not buying her any crack. He said she became angry

and cut him with his red boxcutter that was on a table in his house. He said he pushed her away, smacked the boxcutter from her hand, and hit her face. He thought the victim might have cut his arm. He said he took the victim's car keys and left because he was scared. He denied raping the victim or cutting her hair. He said he was drunk and did not remember everything.

On cross-examination, Investigator Campbell testified that she did not recall the rape kit's results. She said there were nine places from which blood was collected from the mattress. She thought it would be difficult for the victim to have "shucked" her pants off in the manner they were found. She acknowledged that other officers were in the Defendant's home before she arrived and the photographs were taken. She did not know why she never tried to locate the couple from the bar. She did not recall the victim's identifying her attacker by name when she spoke to the victim at the hospital. She said the victim claimed to have picked up two people and dropped off one before taking the Defendant home. She said she checked a name the victim provided in order to see where the person lived. She said the person lived in the area where the victim claimed to have dropped off someone. She did not recall finding a bag of groceries at the Defendant's house but did not recall the victim's telling her about the groceries. She acknowledged that the victim may have said this to another officer. On redirect examination, she said she had a heavy caseload in 2008. She said it was common for officers to enter a crime scene to assess it without disturbing it.

Investigator Bob Odom was recalled and testified that he did not move the boxcutter before photographing it. He said that after he photographed it, he moved it to show its size better, placed a scale next to it, and photographed it again. He said the blade was visible after he moved it. On cross-examination, he said he retracted the blade for safety after photographing the knife.

Tennessee Bureau of Investigation Special Agent Bradley Everett testified as an expert in DNA profiling and serology. He said that the jeans previously identified as the Defendant's contained the Defendant's DNA. He said that the boxcutter contained a mixture of DNA. He said that he obtained a partial profile of the major contributor and that it was consistent with the victim's DNA. The probability of another individual's DNA having the same profile was one in 24,870 in the African-American population, one in 9588 in the Caucasian population, one in 10,390 in the Southeastern Hispanic population, and one in 7943 in the Southwestern Hispanic population.

Agent Everett testified that the victim's DNA was on two towels submitted for testing but that there was no semen on them. Testing of samples from the victim's car indicated the presence of human blood with a DNA profile that was consistent with the Defendant's DNA. Testing of samples from the Defendant's mattress indicated the presence of the victim's and

the Defendant's DNA profiles. He said the probability of an unrelated person having the same DNA profile as either the victim or the Defendant from the African-American, Caucasian, Southeastern Hispanic, or Southwestern Hispanic populations exceeded the world population. A sample from the victim's vagina contained sperm cells, but upon DNA testing, he could not exclude the Defendant as being a possible contributor of the genetic material. He said he did not find any semen in the victim's oral and anal samples.

On cross-examination, Agent Everett testified that DNA could be recovered from bodily fluids or, on occasion, from an object a person had touched. He agreed that it was easier to obtain DNA from a fluid. With respect to the boxcutter, he said that a decision must be made between searching for fingerprint evidence and searching for DNA evidence. The boxcutter was tested for DNA evidence at the request of the local police.

Cindy Simms, the victim's cousin, testified that she and the victim were best friends. She said the victim was forty-four when she passed away. She said that she learned of the crimes when her sister called her and that she visited the victim the morning after the victim was released from the hospital. She said this was one day after the crimes. She said the victim was staying with the victim's sister, Linda Mays. She said that when she saw the victim's injuries, she thought she would lose consciousness. She said she hugged the victim, who said, "He hurt me. He hurt me bad." She said that they embraced and that the victim shook hard and cried so much that she had difficulty understanding the victim. She said she took a long time calming the victim enough to be able to understand her. She said she encouraged the victim to talk about what happened for the victim's benefit. Ms. Simms said she only understood "bits and pieces" because the victim was distraught and childlike.

Ms. Simms testified that the victim was hysterical and told her, "He hurt me there." She said the victim told her she was raped anally and that this was the most upsetting thing to the victim. She said the victim expressed shame. She said that she asked the victim if her assailant was someone the victim knew and that the victim stated she did not know the person and was giving him a ride home. She said the victim stated that she first gave another person a ride home, that she drove to the assailant's house, that she walked to the porch and handed him something, and that he yanked her inside. Ms. Simms said the victim stated that the assailant took her keys and threw them and "something else" the victim had, that he dragged her to another room, that he threatened to cut her with a knife unless she undressed, and that he cut the victim across her leg to show her that he was serious. Ms. Simms stated that the victim described "the anal thing" and that the assailant made quick motions on her back with the knife, laughed, and cut her hair. Ms. Simms said the victim stated that she realized she would die if she did not do something. Ms. Simms said the victim stated that she fled when the assailant's back was turned, that she heard the assailant behind her, that she knocked on the door of a trailer but no one answered, that she felt something touch her

hair as she fled to another door, that she knocked on the other door, that the assailant grabbed her by the ankles, and that her face hit the steps. Ms. Simms said the victim stated that some of her facial injuries probably came from hitting the steps. Ms. Simms said the victim stated that her assailant dragged her by her leg on the sidewalk as she scratched and pulled the ground to try to get away. Ms. Simms said that at this point, the victim was hyperventilating and that she told the victim not to talk about it anymore because the victim was too upset.

Ms. Simms testified that she maintained contact with the victim until the victim's death. She said the victim's personality changed after the crimes. She said that although the victim was small in stature, she had been brave until the crimes, after which she was frightened and physically and mentally "broken." She said that the victim had been outgoing and fun-loving but became withdrawn and stayed home more.

Ms. Simms testified that one or two weeks after the crimes, she was at Linda's house when the victim awoke from a nightmare. She said the victim screamed and said, "Don't let him get me, don't let him get me." She said the victim ran into a wall and fell to the ground.

On cross-examination, Ms. Simms testified that the victim did not give her details about the assailant's telling the victim to undress other than that he told the victim to remove her shirt and that he finished undressing her. She said it was possible the assailant caught the victim after the victim knocked on the first door. She said the victim had no memory from the time her face hit the steps until she was sitting on the sidewalk. Ms. Simms said the victim reported that an unknown person helped her.

Kathy Massey, the victim's sister, testified that she went to the hospital to see the victim at 3:00 or 4:00 a.m. on the day of the crimes. She said that she was the first family member to arrive and that a nurse practitioner told her what happened to the victim. She said that she went into the victim's room and that the victim cried so hard that the victim could not talk. She said the victim received medication and fell asleep but awoke crying, screaming, and fighting. She said that the victim screamed, "Get him off of me," but that the victim eventually calmed when she realized Ms. Massey was there. She said the victim continued this behavior that day and night and the following day. She said the victim also said, "He's going to kill me." She said that the victim's face was bruised and that several cuts were on the victim's legs and back. She said patches of the victim's hair had been cut. She said the victim's hair was "her pride and joy."

Linda Mays, another of the victim's sisters, testified that the victim stayed with her for at least two or three months after being released from the hospital. She said that the victim had been a sound sleeper before the crimes but that after the crimes, the victim had nightmares and awoke screaming, crying, and yelling things like "No, no." Ms. Mays said

-10-

this happened several times. She said that before the crimes, the victim was not fearful and was outgoing but that afterwards, the victim was scared of the dark and did not want anything to do with men. She said that if she had company, the victim went to another room. She thought the victim's fears might have improved slightly when the victim was with her husband but that the victim was not the same person after the crimes.

On cross-examination, Ms. Mays testified that the victim came to stay at her house five to seven days after the crimes. She said the victim's husband was in jail at the time. She said that the victim stayed at her house occasionally and that the victim stayed with her for a couple of nights when the victim's husband went to jail two or three weeks before the crimes. She said the victim had stayed in her home on other previous occasions.

Billy Bales, the victim's widower, testified that he and the victim were together for fourteen years until her death and that the victim had two children from a previous relationship. He said he was serving a sentence for a probation violation in the Carter County Jail when the victim reported being raped. He said the night of the crimes was the first night he was away from home. He said that after he served his sentence, he and the victim lived together at their home. He said the victim's personality changed after the crimes. He said she was scared, had trouble sleeping, was afraid of the dark, would not go outside, and was withdrawn and depressed. He said the victim would no longer talk to him when he asked her what was wrong. He said that their physical relationship changed, that the victim could not touch or kiss him, and that he could not hug her. He said they were no longer able to have sexual relations. He said that when he came home three and one-half months after the crimes, the victim's physical injuries were healing but that she could not look at herself in a mirror. He said she removed all of the mirrors in the house. He said she no longer slept through the night, kept the lights on, and only slept during the day for a time. He said the victim sometimes jerked and flailed her arms in her sleep and awoke screaming, slapping, and hitting him. He said that this happened nightly for about one year and that over time, she became less physical but still awoke in a hysterical state.

Mr. Bales identified a photograph of the victim's car. He said he paid $700 for it and installed an ignition that cost $240. He did not recall whether the car was titled in his or the victim's name but said it was her car. He identified the victim's shoes, pants, and underwear in previously admitted photograph exhibits. He also identified her hair in a photograph.

On cross-examination, Mr. Bales testified that he and the victim had a good relationship before the crimes. He said that they had separated about one year earlier but that he felt like they had reconciled. He did not know why the victim was in Johnson City on the night of the crimes. He said the victim did not want to stay home alone but was not upset about the underlying crime for his probation violation. He acknowledged that he had

-11-

multiple DUI convictions. He agreed he knew before first seeing the photographs that they were from the crimes against his wife. The State rested.

Crystal Chapman testified for the defense that she had known the Defendant for about twenty years and that she had dated his brother. She said that on the evening of the offenses, the Defendant called to invite her and her then-boyfriend, David Murphy, to meet him at a bar. She said the Defendant was already at the bar when they arrived around 10:00 to 10:30 p.m. She said that a woman arrived about fifteen minutes later and that she and the woman began a conversation about ten minutes later. While the Defendant, Mr. Murphy, and she were seated at a booth, the woman asked if she could sit with them. She also said that she offered for the woman to sit with them. She said that none of them knew the woman, who was alone. The woman sat next to the Defendant. Ms. Chapman said they were together at the bar for about one and one-half hours drinking beer. She said that the Defendant invited them to his house for drinks but that she and Mr. Murphy declined. She was unsure about the time they left but estimated it was around midnight or 1:00 a.m. She said the Defendant and the woman left together. She said the woman seemed willing to leave with the Defendant and did not need coaxing.

On cross-examination, Ms. Chapman testified that she did not know how the Defendant got to the bar. She thought he arrived shortly before she and Mr. Murphy did. She did not know that the victim was admitted to the emergency room at 12:54 a.m. She did not see either the Defendant or the woman after they left together. On redirect examination, she agreed that they left the bar after midnight and that her time estimate might be inaccurate.

David Murphy testified that he was involved with Ms. Chapman on the night of the offenses. He said they agreed to meet the Defendant at a bar. He said he had met the Defendant once before that night and did not really know him. He said that they arrived at the bar around 10:00 p.m. and that the Defendant was already there or arrived shortly thereafter. He said he did not drink. He said that the Defendant and Ms. Chapman drank that night but that he did not think they drank excessively. He said a woman whom none of them knew joined their group. He said that he and Ms. Chapman left about forty-five minutes after they arrived. He thought they left before midnight. He said the Defendant and the woman left together. He said the woman left willingly. He thought Ms. Chapman might have gone outside with the Defendant and the woman for a few minutes.

On cross-examination, Mr. Murphy testified that he was unsure if the woman was at the bar the entire forty-five minutes he and Ms. Chapman were there and thought she probably arrived after they arrived. He said she was petite and seemed nice. He said he was not drinking or taking drugs that night. He did not remember how the Defendant got to the bar. He did not think the Defendant was intoxicated.

-12-

After receiving the proof, the jury found the Defendant guilty of the charged offenses of aggravated rape by vaginal penetration and especially aggravated kidnapping. It found him guilty of unauthorized use of a vehicle as a lesser included offense of theft of property. It acquitted him of aggravated rape by anal penetration. After the court imposed an effective fifty-eight-year sentence, the Defendant appealed.

## I & II

The Defendant contends that the evidence is insufficient to support his conviction for especially aggravated kidnapping. Resolution of the issue involves his contention in a separate issue that due process principles are violated by convictions for both especially aggravated kidnapping and aggravated rape. The State contends that the evidence is sufficient to support the especially aggravated kidnapping conviction and that dual convictions for especially aggravated kidnapping and aggravated rape are proper. We conclude that the proof supports a conviction for especially aggravated kidnapping and that the proof supports dual convictions of especially aggravated kidnapping and aggravated rape. We also conclude that the jury was not properly instructed that in order to convict the Defendant of especially aggravated kidnapping, it must find that the Defendant substantially interfered with the victim's liberty in a way that was not essentially incidental to the rape but that the error was harmless beyond a reasonable doubt.

### A. Sufficiency of the Evidence

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S .W.2d 651, 659 (Tenn. 1997).

Relevant to this case, especially aggravated kidnapping "is false imprisonment . . . [a]ccomplished with a deadly weapon or by display of an article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. § 39-13-305(a)(1) (2010). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." <u>Id.</u> § 39-13-302(a).

The Defendant argues that the evidence is insufficient to support the conviction because his DNA was not identified on the boxcutter. We do not view the lack of DNA evidence as meaningful. The record reflects that a red boxcutter was found outside Ms. Upright's home, where the victim was found and where the Defendant was seen hours earlier. The Defendant admitted that the boxcutter was his and that he "may have" cut the victim with it earlier when they were inside the trailer. That said, further analysis is necessary to address the question of the sufficiency of the evidence.

The victim took the Defendant to his home and helped him carry something to the door. He pulled her inside, threatened her life, took her car keys, cut her skin and hair with a boxcutter, beat her, took her into a bedroom, and sexually assaulted her. After the assault, the naked victim thought the Defendant would kill her and fled outside when the Defendant turned away. She went to the door of another trailer as the Defendant chased her but was unable to get help. She ran to Ms. Upright's home. The Defendant grabbed her ankles, caused her to fall and strike her head on some stairs, and dragged her by her feet along the sidewalk. When Ms. Upright came to the door, the victim was about halfway under the trailer and the trailer's underpinning was damaged. A naked man, whom Ms. Upright later identified as the Defendant, was standing about fifteen feet away and fled toward the Defendant's home when she saw him. The Defendant left the scene in the victim's car. A red boxcutter was found on the ground outside Ms. Upright's trailer. The victim had extensive facial bruising and cuts on her legs and back. She had multiple facial fractures around her eyes and broken bones in her nose.

Were there not a separate aggravated rape charge to consider, we would conclude that this evidence is sufficient to support the especially aggravated kidnapping conviction. Because there is an aggravated rape charge, though, resolution of whether the evidence is sufficient to support the especially aggravated kidnapping conviction is complicated by the separate charge of aggravated rape. Conviction of both offenses is appropriate only if the removal or confinement of the victim was not essentially incidental to the victim's rape.

## B. Due Process

As a further component of our sufficiency of the evidence review, we turn to the Defendant's due process issue. After the parties filed their briefs and argued this case orally, our supreme court overruled the existing caselaw providing the due process analysis to be applied upon appellate review of dual convictions of kidnapping and an accompanying felony. See State v. White, 362 S.W.3d 559, 578 (Tenn. 2012) (overruling State v. Richardson, 251 S.W.3d 438 (Tenn. 2008); State v. Fuller, 172 S.W.3d. 533 (Tenn. 2005); State v. Cozart, 54 S.W.3d 242 (Tenn. 2001); State v. Dixon, 957 S.W.2d 532 (Tenn. 1997); State v. Anthony, 817 S.W.2d 299 (Tenn. 1991)). Previously, an appellate court was required

to conduct a due process inquiry in order to determine whether dual convictions were constitutionally permissible. See, e.g., Richardson, 251 S.W.3d 438. In White, the court said that a separate appellate due process analysis is not necessary. The court held that the inquiry "is a question for the jury after the appropriate instructions," with appellate review of the sufficiency of the evidence serving as the due process protection. White, 362 S.W.3d at 577-78. The supreme court provided a jury instruction regarding the "substantial interference" element of kidnapping:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> > • the nature and duration of the victim's removal or confinement by the defendant;
> >
> > • whether the removal or confinement occurred during the commission of the separate offense;
> >
> > • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
> >
> > • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
> >
> > • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
> >
> > • whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 ("We invite the Tennessee Pattern Jury Instruction Committee to promulgate a pattern jury instruction for those trials in which a defendant is indicted for kidnapping and

an accompanying felony. Until the development of an appropriate instruction, however, the language articulated herein shall apply.") (footnotes omitted).

Under White, an instruction is required if the proof "fairly raised" a question of whether there was a kidnapping offense separate from the accompanying felony. See State v. Bennie Osby, No. W2012-00408-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. Nov. 2, 2012), perm. app. filed (Tenn. Dec. 11, 2012). In this pre-White case, the jury was not so instructed. There was evidence that the Defendant pulled the victim into the trailer, took her car keys, threatened her life, cut her with a knife, chased her as she fled to seek help from neighbors, grabbed her by her ankles as she attempted to reach Ms. Upright's door, and pulled her across the sidewalk. The Defendant argues in his brief that the only facts relevant to the kidnapping are those occurring before the victim fled the trailer, where the victim said the rape occurred. We note that kidnapping is a continuous crime. State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999) ("[A]n act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime [of kidnapping] at every moment the victim's liberty is taken."); see State v. Campbell, 245 S.W.3d 331, 337 (Tenn. 2008) (noting the court's conclusion in Legg that the crime of kidnapping "continued until [the victim's] liberty was restored"). This court has taken an expansive view of kidnapping. See State v. Evangeline Combs and Joseph D. Combs, Nos. E2000-02801-CCA-R3-CD and E2000-02800-CCA-R3-CD (Tenn. Crim. App. Sept. 25, 2002) (stating in a case involving kidnapping arising from seven years of enslavement and torture, "we reject the Defendants' argument that no confinement was proved because she escaped on three occasions and voluntarily returned twice"), perm. app. denied (Tenn. Jan. 27, 2003).

Upon review, we conclude that the facts demonstrate that the Defendant's actions fairly raised the issue of whether they were incidental to the aggravated rape. A separate jury issue was raised regarding whether the offense of especially aggravated kidnapping occurred. The absence of the White jury instruction was error.

The question becomes, then, whether the error was harmless beyond a reasonable doubt. See White, 362 S.W.3d at 580 n.20 ("Because we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error, we cannot find the error harmless."); Bennie Osby, slip op. at 9 (applying harmless beyond a reasonable doubt standard to omission of White instruction). Given the evidence in this case, we conclude that the State's evidence was so overwhelming as to assure that the White instructional error was harmless beyond a reasonable doubt. See White, 368 S.W.3d at 580-81 (concluding that absence of the White instruction was not harmless beyond a reasonable doubt where there was not overwhelming proof that the victims' removal or confinement went beyond that necessary to accomplish the accompanying felonies); see also Antonio Richardson v. Ronald Colson, Warden, No. 3:12-CV-409 (M.D. Tenn. July 9, 2012)

(stating that the decision in White was largely dependent on the appellate court's determination that the evidence was equivocal regarding whether the victim's movement or confinement was essentially incidental to the robbery, whereas the evidence in the case before the court was not equivocal).

The facts support a conclusion that the Defendant's chasing the victim was not in order to accomplish the rape, which had already occurred, nor was it inherent in the then-completed aggravated rape. His chasing her kept her from retrieving her car keys, which he had taken from her and thrown inside his trailer. The facts also support a conclusion that the Defendant's actions created significant danger or risk of harm. He chased the victim with the boxcutter, having already demonstrated his intent and willingness to cut her and having threatened her life. As the victim reached Ms. Upright's trailer, the Defendant grabbed her ankles, causing her to sustain significant injuries to her head, and pulled her down the sidewalk, preventing her from summoning help. A jury could find that Ms. Upright's investigation of the noise she heard outside was a fortuitous intervening circumstance that frightened the Defendant into abandoning his further removal or confinement of the victim after the rape. The only reasonable conclusion to be drawn from the evidence is that the Defendant's actions were well beyond that necessary to consummate the rape. The lack of the White instruction was harmless beyond a reasonable doubt.

## C. Election of Offenses

As part of our analysis, we have considered whether the State had an obligation to elect facts upon which it relied as proof of especially aggravated kidnapping based upon a theory that the proof demonstrated two possible kidnapping episodes. See, e.g., State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1998) (requiring election of offenses to ensure juror unanimity); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). As we have noted, the Defendant argues in his brief for a narrow view of the facts that ignores the Defendant's restraint of the victim after she fled his trailer. At oral argument, the Defendant urged us to consider the events that occurred after the victim fled as a new set of facts demonstrating an attempted aggravated kidnapping separate from a kidnapping that was merely incidental to the rape. The State argues in its brief that the evidence is sufficient to support the especially aggravated kidnapping conviction based upon evidence that the Defendant threatened the victim with a knife inside the trailer, that he admitted he may have cut her with a box cutter inside the trailer, and that he chased her when she escaped the trailer and dragged her down the sidewalk. The State also argues that due process permitted dual convictions of aggravated rape and especially aggravated kidnapping based upon the Defendant's actions after the victim fled the trailer. At oral argument, the State

acknowledged the inconsistent positions taken in its brief but relied upon the events outside the trailer as proof of an especially aggravated kidnapping separate from the aggravated rape.

As we have noted, Tennessee courts take an expansive view of kidnapping. Because we have concluded that the facts demonstrated a single kidnapping from a continuing course of conduct, we conclude that there was no issue regarding election of kidnapping offenses.

In summary, there is sufficient evidence to support a separate conviction of especially aggravated kidnapping. The lack of a White instruction regarding whether there were separate offenses of aggravated rape and especially aggravated kidnapping was harmless beyond a reasonable doubt. The State was not required to elect a set of facts upon which it relied to support the especially aggravated kidnapping charge. The Defendant is not entitled to relief.

## III

The Defendant contends that the trial court erred in admitting hearsay testimony regarding the victim's statements to Ms. Simms. The State counters that the trial court did not abuse its discretion in admitting the evidence, but even if it did, the error was harmless because Ms. Simms's testimony was "largely cumulative" of other evidence. We conclude that the trial court erred in admitting the evidence but that the error was harmless.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. Id. at 802. One exception to the hearsay rule is for an excited utterance, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id. at 803(2). Our supreme court has stated three prerequisites to admission pursuant to the excited utterance exception:

> The first requirement is "a startling event or condition" that "'suspend[s] the normal, reflective thought processes of the declarant.'" State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001) (quoting State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997)) (other internal quotations omitted) [(abrogated by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004))]. Second, the statement must "relate to" the startling event or condition. Id. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." Gordon, 952 S.W.2d at 820

-18-

(quotation omitted); [Neil P.] Cohen et al., [Tennessee Law of Evidence (5th ed. 2005)] § 8.07[3][c], at 8-76. The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." Stout, 46 S.W.3d at 699-700. This requirement considers a variety of factors, including the interval of time between the startling event and the statement. Id. at 700.

State v. Franklin, 308 S.W.3d 799, 823 (Tenn. 2010) (footnotes omitted).

The record reflects that the victim's statements to Ms. Simms were made on two occasions. First, the victim talked to Ms. Simms shortly after the victim's hospital release. Second, Ms. Simms was at Ms. Mays's house a week or two later when the victim awoke from a nightmare and made statements.

Regarding the victim's statements on the morning after her release from the hospital, we note that the crimes occurred in the late night hours of August 28, 2008, or the early morning hours of August 29, 2008. The hospital records reflect that the victim was admitted on August 29 at 12:54 a.m. and that she was discharged on August 30, 2008 at 2:30 p.m. Ms. Simms testified that she did not visit the victim at the hospital and that she saw the victim the morning after the victim's hospital release. She also said that this was the day after the victim was attacked. Based upon the hospital records and Ms. Simms's statement that the conversation occurred when she visited the victim at Ms. Mays's house the morning after the victim's hospital release, we conclude that the victim's first statements to Ms. Simms occurred on the morning of August 31.

The Defendant argues that the emotional event that precipitated the victim's statements about the crimes was the victim's seeing Ms. Simms. The State contends that the startling event was the rape and kidnapping. Ms. Simms testified that when she first saw the victim, she felt as if she would faint. She said that she put her arms around the victim and that the victim said, "He hurt me. He hurt me bad." She then testified:

Q.    Let me slow you down just a second. You come in the door, could you tell if there's anything wrong with [the victim]?

A.    Oh, yeah. I didn't recognize her her face was so bad.

Q.    And how did she react to you coming in, did she see you come in?

A.    Yes. She went to try to get up and I made it to her and I said, "It's okay. I'm here." And that's when she wrapped her arms around me and then

-19-

she started shaking real bad, crying so bad I couldn't hardly understand the words she would say[.]

The trial court considered the victim's seeing Ms. Simms to be the startling event that precipitated the victim's emotional response and statements. We must defer to the trial court's factual findings of predicate facts regarding the application of an exception to the hearsay rule. State v. Gilley, 297 S.W.3d 739, 761 (Tenn. Crim. App. 2008). The evidence does not preponderate against the court's determination in this regard. See id.

The question of whether the resulting statements were related to the startling event is more difficult. Our supreme court has said that although the startling event is typically the act at issue in the case, a "subsequent startling event or condition which is related to the prior event can produce an excited utterance." Gordon, 952 S.W.2d at 820.

In Gordon, the three-year-old aggravated rape victim cried out in pain on two occasions when trying to use the restroom. When her mother saw evidence of injury and blood inside the victim's vagina, she asked the victim, "Who made you hurt like this?" The victim identified the defendant. The supreme court said that "the victim's painful urination was a sufficiently serious and startling event under the rule." Id. at 821. After determining that the evidence met the other criteria for admissibility, it concluded that the trial court did not abuse its discretion in admitting the evidence. Id. Gordon emphasized that the time interval between the startling event and the statements is not determinative. Id. at 820. Rather, the time interval is one consideration in determining if the statement was made under the stress of excitement. Id.; see also Stout, 46 S.W.3d at 699-700.

One of the cases upon which Gordon relied was United States v. Napier, 518 F.2d 316 (9th Cir. 1975), in which the victim was kidnapped and severely assaulted, causing brain damage that hindered her ability to communicate except with simple words and phrases. About one week after the victim was released from her seven-week hospitalization that included two brain surgeries, her sister showed her a newspaper article and photograph of the defendant. Upon seeing the photograph, the victim became distressed and said clearly, "He killed me, he killed me." In determining that the trial court properly admitted the evidence as an excited utterance under Federal Rule of Evidence 803(2), the appellate court rejected the defendant's argument that the evidence should have been excluded because it was not made under the stress of excitement of the assault. Id. at 317-18. Rather, the evidence that the victim identified the defendant as her assailant was admissible because it related to the stress of excitement of seeing the photograph. See id.; Gordon, 952 S.W.2d at 819.

-20-

In the present case, the startling event that preceded the victim's statements was the victim's seeing Ms. Simms. Although the victim became distraught and made statements about the rape and kidnapping upon seeing Ms. Simms, unlike Gordon and Napier, there is nothing in this case linking the startling event to the subject of the statements. In Gordon, the victim's painful attempts to use the restroom prompted her to identify the person who caused the injuries that resulted in her pain. In Napier, the victim's viewing the defendant's photograph related to the defendant's identity as the person who injured her. Because the evidence does not demonstrate any connection between the startling event of seeing Ms. Simms and the subsequent statements about the rape and kidnapping, the evidence should not have been admitted as an excited utterance.

The second admission of evidence of this nature involved Ms. Simms's testimony that she was present when the victim awoke from a nightmare, screamed, said, "Don't let him get me, don't let him get me," and fell after running into a wall. Aside from stating that this statement was made even later than the earlier statements to Ms. Simms, the Defendant does not explain why this evidence was inadmissible as an excited utterance. We note that the victim's statement was made under the stress of excitement of a nightmare. In the context of the victim's changes in her sleeping habits and difficulty sleeping following the crimes, the statement "deal[t] with the effect or impact of the [startling] event or condition." See Gordon, 952 S.W.2d at 820. The evidence of the victim's agitation when she awoke and made the statement demonstrates that the statement was made while "under the stress or excitement from the event or condition." Stout, 46 S.W.3d at 699-700. The trial court did not err in admitting the evidence as an excited utterance.

The Defendant argues, though, that the Ms. Simms's testimony about the victim's statements should have been excluded under Tennessee Rule of Evidence 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, advisory comm'n notes).

The Defendant argues that Ms. Simms was "an extremely emotional witness" and that her testimony "delivered a significant amount of 'emotionally charged' testimony to the jury." We note that the appellate record does not reflect that Ms. Simms engaged in any emotionally prejudicial conduct during her testimony, nor did the Defendant make a contemporaneous objection to her testimony on this basis. With regard to whether her

testimony about the nightmare and accompanying statement was unfairly prejudicial, we conclude that the trial court did not abuse its discretion in ruling that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The evidence was probative of whether the victim was raped and kidnapped, particularly when viewed in conjunction with other evidence that she had previously been a sound sleeper but experienced serious sleep disturbances after the crimes.

Having concluded that the trial court erred in admitting Ms. Simms's testimony about the victim's statements on August 31 as the victim's excited utterances but did not err in admitting Ms. Simms's testimony about the victim's excited utterances after awaking from a nightmare, we will consider whether the evidentiary error was harmful, i.e., an "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process[.]" T.R.A.P. 36(b). The victim's statements in Ms. Simms's testimony were substantially the same as multiple statements the victim gave to various physicians at the hospital shortly after the crimes. The victim's medical records were received as an exhibit and included the physicians' reports summarizing the victim's statements to them about the facts of the crime. The records were properly received as statements made for the purposes of medical diagnosis and treatment. See Tenn. R. Evid. 803(4). The Rule provides that a statement about the "inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment" is admissible as a hearsay exception. Id. Because Ms. Simms's testimony about the victim's statements on August 31 was the subject of and consistent with other admissible evidence, we conclude that the error was harmless.

In consideration of the foregoing and the record as a whole, the judgments of the trail court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE